HENRY G. MORTON, HANNAH L. MORTON, AND JONATHAN BLAKE,
*v.* DANIEL H. ONION, EXECUTOR OF POLLY CARY.

*Married Woman. Will.*

The rule that the marriage of a woman revoked a will made by her before marriage,
rested for its reason on the fact that, by virtue of the husband's marital rights, the
woman, becoming *covert,* became thereby disabled to dispose of the property named in
the will,—the will ceased to be ambulatory. Hence, where a *feme sole* made a will, and
married, and a considerable portion of the property disposed of by the will remained
in her, unaffected upon her death by any marital rights of her husband, who survived
her, it was *held,* that the will was entitled to be probated.

APPEAL from a decree of the probate court for the district of
Chittenden, establishing the will of the said Polly Cary. Trial
by jury, at the April term, 1871, Chittenden county, PIERPOINT,
Ch. J., presiding.

The said Hannah, who is the wife of the said Henry, was a
niece, and the said Jonathan was a nephew, of the said Polly,
and both were heirs of the said Polly. The will was execu-
ted on the 20th day of October, 1864, and at the time of its
execution, said Polly was a single woman, and her name was
Polly Tomberson. On the 3d day of February, 1867, said Polly
was legally married to Jonathan W. Cary, and died in August,
1868, while the wife of the said Jonathan. The probate of
said will was opposed by the contestants, because it was executed
by the said Polly while she was sole and unmarried; and, after
the execution thereof, she married the said Jonathan, and was his
lawful wife at the time of her death.

On trial, the proponent, after introducing the subscribing wit-
nesses to the will, who gave testimony tending to show its legal
execution, introduced said Jonathan, who testified that he mar-
ried the said Polly about the 2d day of February, 1867. The
proponent then offered to prove by him what transpired between
him and the said Polly before the marriage, and subsequently; and
that subsequently the understanding was substantially fulfilled,
and that the witness then desired the will to be established. To
this testimony, the contestants objected, but the same was admit-
20

ted by the court, limiting it to what passed between the parties prior to the marriage, in relation to the will, and to the assent of the witness since the death of said Polly. Exceptions by contestants on both points. The witness then testified, under objection, that before his marriage to said Polly, he knew she had made a will; that she told him she had; that she told him she had willed to a missionary society, of New York, eight thousand dollars, in consideration it should not amount to over one half her property, and her niece, Mrs. Hannah Morton, of St. Albans, was to have all her household furniture and clothing, and the remainder, after paying debts and funeral expenses, was to go to the congregational society of Milton; that it was understood she was to make some provision for the witness out of her property; that this was an agreement before marriage; that her mother was to have provision out of it if she survived; that she made an arrangement for the witness which was a life provision for him; that what she proposed to do, was satisfactory to the witness at the time; that ît was then his desire that the will should be carried out. To the admission of all which testimony, the contestants excepted.

On cross-examination, this witness testified that he lived with Miss Tomberson before their marriage, and that she informed him just before the marriage, that in case of marriage, she would change her will; that that was the understanding when he married her; that it was an arrangement at the time of the marriage, that she should change the will, so that he would have a maintenance out of the property—have the use of the property, a part of it, after her death; and that after the death of the said Polly, he claimed all the personal property which was on the estate there; that his claim to it, and his claim to the estate, were settled by an arbitration which lasted about eighteen days; that he was not present at the probate court when this case was heard, but that he gave his consent in writing to the establishment of the will, to be used there.

The contestants asked the witness to state how that writing was procured of him, by whom, and where; which was objected to by the proponent, and excluded by the court, to which the con-

testants excepted. The witness then stated, that thirty-five days after the death of Mrs. Cary, he signed the paper assenting to said will, which was used at the probate court; that said paper was signed at Jed P. Clark's office, in Milton; that Clark, Chester Witters, and Dr. Onion, were present. The witness was then asked to detail to the jury that transaction, to which the proponent objected.

The contestants then offered to show by the witness that he was induced to give his consent to this will by false representations, representations which turned out to be untrue when he first gave his assent to the establishment of this will, which was excluded by the court. They then proposed to show, that after Mrs. Cary's death, Mr. Cary asserted that he should not consent to the will, and did not consent to it; and that about thirty-five days after her death, in the office of Jed P. Clark, Mr. Cary was induced to sign a written consent, by representations held out to him on the part of Dr. Onion, the executor, which were false in themselves; that he was induced, on false representations, to give his written consent, and did give it under these circumstances; and that subsequent to giving that consent under these circumstances, his rights in regard to his claim to the real estate, and all of his interest by way of law, or otherwise, in the personal property of the estate, were submitted to Judge Russell, of Burlington, and Judge Sampson, of St. Albans, and an arbitration held, and the rights of said Jonathan determined, and that the award of that arbitration had been complied with, and that the witness then had no interest whatever in the estate as to whether the will was established or not.

The court decided that, as it was admitted that the assent of the said Cary to the establishment of the will then given in court, was without misunderstanding or misconception, but given with a full knowledge of all the facts, the evidence offered became immaterial, and excluded it; to which the contestants excepted.

On re-direct examination, this witness stated that he had no children born alive of this marriage; that he was married on the 2d day of February, 1867, and that Mrs. Cary died on the 2d day of August, eighteen months afterwards. He was asked whether

his support was provided for subsequent to the marriage, and said it was, which was objected to. He was asked to state whether it was done to his satisfaction. The contestants objected to the witness stating what took place on the subject after marriage. But the court admitted the same; to which the contestants excepted. The witness stated that it was agreed upon by him and his wife, and that it was satisfactory; that he had a lease of her farm. To this the contestants excepted.

On re-cross examination, the witness stated that he was to have the use of the homestead, farm, and the cattle, during his life; that he did not have them, but he had a substitute on the Dixon farm; but that he claimed after the death of his wife, that the understanding was before marriage that he was to have her watch and the safe, which, in the will, were otherwise disposed of; and that the agreement to change the will was before marriage; that he testified before the arbitrators, and said then that he was to have the use of her property during his life.

The will was then read; to which the contestants excepted.

The contestants introduced a certified copy of the certificate of the marriage of Mrs. Cary, by which it appeared that she was married to Jonathan W. Cary on the 3d day of February, 1867, and then rested their case. The facts which the evidence tended to prove not being controverted, and neither party desiring to go to the jury upon any fact in the case, the court directed the jury to return a verdict establishing the will. Exceptions by contestants.

*Davis & Adams* and *E. R. Hard*, for the contestants.

The common law rule that the will of a *feme sole*, whether of real or personal estate, is, under the statute of Henry VIII., and similar ones, absolutely revoked in law by her subsequent marriage, is established beyond controversy by a uniform course of decisions, both English and American, extending from *Forse and Hembling's* case, 4 Co. 60, to the present time, and is sustained by all the elementary writers upon the subject. 1 Jarman, 37; 4 Kent Com. 624; 1 Redf. on Wills, 293; Sch. Dom. Rel. 251; 1 Wms. Exrs. 93–5; 4 Burn Ec. Law, 47.

The marriage of the testatrix was a complete revocation of her will, both as to her real and personal estate. The application of the foregoing rule to this case, is sought to be avoided on the ground that, at the time of the execution of the will, and of the decease of the testatrix, married women, by virtue of the general provisions of the statutes of this state concerning wills, could dispose of their estates, both real and personal, by will. The act of 1847 expressly gave married women power to devise. their lands, tenements, and hereditaments; but prior to that statute, married women possessed no testamentary powers, except the limited ones which existed under the statutes of Henry VIII.

Before the passage of 34 & 35 Henry VIII., which expressly prohibited devises by married women, it was held that under the 22 Henry VIII. (which is substantially the same as sec. 1, ch. 49 of our Gen. Stat.), a married woman could not make a valid will of lands. 1 Jarman, 30 ; 1 Pow. on Dev. 140 ; *Colverly's* case, Dyer, 354. Under statutes almost identical in phraseology with § 1 above referred to, it has been held in Massachusetts, New Hampshire, and several other states, that married women were incompetent to make valid wills. *Osgood* v. *Breed*, 12 Mass. 525 ; *Marston* v. *Norton*, 5 N. H. 211 ; Sch. Dom. Rel. 258.

But, whatever the statutory source of a married woman's power to make a will, the rule that her subsequent marriage is a revocation of her will, is in full force in this state. The rule is of such long standing, and so thoroughly established, that it is reasonable to suppose that the legislature would have expressly declared its abrogation, if such was the intention. The rule of revocation by marriage was always, under the statutes of Henry VIII., and similar ones, applied as well to wills which, even under those statutes, a married woman was empowered to make, as to those which she was held incompetent to make. Even when general testamentary power is denied, she has always been held competent, independently of any control or consent of her husband, to make a testamentary disposition of personalty, not reduced to possession, to which she is entitled as executrix ; of personalty coming or secured to her separate use during coverture ; of savings out of an allowance made by her husband for her separate

use ; of assets and accumulations of property conveyed to trustees for her separate use ; of all her estate, real and personal, when her husband is *civiliter mortuus ;* and, with the consent of her husband, of any or all of her personalty. She may also make a testamentary disposition of both real and personal estate, under a power for that purpose. 1 Redf. on Wills, 22, *et seq. ;* 1 Jarman, 30, *et seq. ;* Sch. Dom. Rel. 251, *et seq. ; Taylor* v. *Mead,* 10 Jur. N. S. 127 ; *Hale* v. *Waterhouse,* 11 Jur. N. S. 361 ; *Holman* v. *Perry,* 4 Met. 496. Yet the rule under consideration has always been expressed by elementary writers, and by judges, without any qualification or exception, and in language clearly embracing cases in which the will of a married woman would be valid, as well as in cases in which it would not be. *Van Wert* v. *Benedict,* 1 Barb. Sur. R. 119 ; *Southby* v. *Stonehouse,* 2 Ves. Sen. 611 ; *Marlboro* v. *Godolphin,* Ib. 75 ; *Cotter* v. *Layer,* 2 P. Wms. 623 ; *Hodsden* v. *Lloyd,* 2 Bro. C. C. 534 ; S. C. 2 T. R. 684, entitled *Doe d. Hodsden* v. *Staple ; L omis* v. *Loomis,* 51 Barb. 257.

At the time of the execution of this will, there was no statute, expressly, or otherwise, empowering married women to dispose of their personalty by will. But, it is claimed, that as to the personalty, the will is rendered valid by the assent of the husband during coverture, and since the decease of the testatrix. At common law, except in the instances above referred to, and, perhaps, some others, the assent of the husband is essential to the validity of a married woman's will. 1 Jarman, 31, 32 ; 1 Redf. on Wills, 22 ; *Cutler* v. *Butler,* 5 Foster, 343 ; *George* v. *Bussing,* 15 B. Mon. 558 ; *Newlin* v. *Freeman,* 1 Ired. 514. The evidence does not show such assent before the decease of the testatrix ; and if the will was revoked by the marriage, his subsequent assent alone, after marriage, would not revive it. 1 Redf. on Wills, 374 ; Sch. Dom. Rel. 259.

*C. W. Witters, H. S. Royce, Daniel Roberts,* and *E. J. Phelps,* for the proponent.

The question is upon the *probate* of the will ; and it must be probated, unless *wholly* revoked after execution. A revocation

may be total, or partial. If only partial, the will must be established subject to such partial revocation, that it may operate so far as not revoked. The question is not what property may pass under the will. It may be a good will, though there be nothing to pass under it. *Waters* v. *Cullen,* 2 Bradf. 354; *Osgood* v. *Breed,* 12 Mass. 533; *Paglar* v. *Tongue,* 1 P. & D. 158; 1 Jarman, 23; *Blandin* v. *Blandin,* 9 Vt. 210. But, it is claimed that the will was revoked *by implication of law,* by reason of the subsequent marriage of the testatrix. This objection cannot prevail, because it does not appear that such revocation was necessarily total, and because it does not appear that the contestants have such an interest as to give them the right to raise the question. The rule that coverture revoked the will of a *feme sole,* was never absolute and universal. 1 Wms. Exrs. 156; 1 Redf. on Wills, 293; Sch. Dom. Rel. 251. Manifestly, that rule does not apply to a case in which the marriage works no change of condition as to the power of disposing. But a *feme covert* may devise what she holds as executrix. So when the estate was limited to uses, and a power was given to declare the uses, she could declare the uses by her will. So when the estate comes to her, or is held by her, to her sole and separate use, the *jus disponendi* is necessarily incident; as to such estate, she is a *feme sole,* and may dispose of it by will. 1 Wms. Exrs. 46, 156; 1 Jarman, 31–33; Sch. Dom. Rel. 253 *et seq.; Bradish* v. *Gibbs,* 3 Johns. Ch. 523; *American Mis. Soci.* v. *Wadhams,* 10 Barb. 597; S. C. 2 Kernan, 415; *Frary* v. *Booth,* 37 Vt. 78. As to such estate, so held, the will of a *feme sole* could not be affected by marriage. *Logan* v. *Bell,* 1 C. B. 873; *Hodsden* v. *Staple,* 2 T. R. 684. Since, then, it does not appear by what title the estate named in the will was held, it cannot be said, under the English rule, that the marriage of the testatrix revoked the will, either wholly or in part.

The rule was made only for the sake of the husband, and since in this case the husband is satisfied with the will, and assents to its probate, the contestants have no such relation to the question, or *status* in court, as to enable them to raise the question. 1 Jarman, 110; *Sheath* v. *York,* 1 Ves. & B. 390. Admitting that by

the English law the will of a *feme sole* is generally revoked by marriage, that rule does not apply in Vermont. The reason of the rule has no application here, and *cessat ratio, cessat lex.* In England, her disability to devise *lands* was declared, if not created, by statute. 34 & 35 H. 8, ch. 5, s. 14; 1 Jarman, 30; 1 Wms. Exrs. 45; *Fisher* v. *Kimball,* 17 Vt. 328. Her disability to bequeath *personal* estate, was a rule of law based upon notions of public policy as connected with the dominant rights of the husband. 1 Jarman, 30; Sch. Dom. Rel. 251. In Vermont, the testamentary power of the wife is as ample as that of the husband, and, it would seem, has always been so. Statutes of 1797, p. 209; Slade's Stat. 336; REDFIELD, J., in *Fisher* v. *Kimball, supra;* Rev. Stat. (1839) ch. 45, §§ 1, 4; *Allen* v. *Little,* 5 Ohio, 65; Sch. Dom. Rel. 258. In 1847, the power was expressly given to married women to devise their real estate, and in 1870, to bequeath their personalty. But, whether or not such right has always existed in this state, it existed at the date of the execution of this will, and ever since. The English rule does not apply here, for the further reason, that " we have no wills as, or by force, of common or ecclesiastical law, but only by, statute." BARRETT, J., in *Warner* v. *Warner,* 37 Vt. 368; and no statute has ordained that marriage shall revoke the will of a *feme sole.* By English, as well as by American, law, the wife can, without any enabling statute, make a valid will of personalty, with consent of her husband, but upon condition that he survive her, and does not after her death disaffirm his consent already given. *Fisher* v. *Kimball, supra;* 1 Wms. Exrs. 46, 47; Sch. Dom. Rel. 251-2-3, and note. The husband consented to this will during coverture, and since, and expressed his desire to the probate court, and to the county court, that it be probated. This is a clear waiver of any right which he may have had. Sch. Dom. Rel. 252; 1 Wms. Exrs. 45-49; 1 Redf. on Wills, 25.

The opinion of the court was delivered by

BARRETT, J. It is the opinion of the court that the rule, that the marriage of a woman revoked a will made by her before marriage, rested for its reason on the fact, that, by virtue of the hus-

band's marital rights, the woman becoming *covert* became thereby disabled to dispose of the property named in the will. The will ceased to be ambulatory. It is only in view of the supervening rights of the husband, accruing by the fact of marriage, as to her property, that the rule had any ground or reason. The change of condition effected by marriage, as that expression is sometimes used, derives all its significance, as well as its operative force, as a revocation of a will, from the fact that peculiar rights accrue to the husband in respect to the property owned by the wife at the time of, or coming to her during, her coverture. Under our statutes since 1797, that rule could have operation in this state only for the reason thus assigned, for they contain no disabling provisions. In the present case, considerable of the property disposed of by the will remained in the testatrix, unaffected upon her death, by any marital rights of the husband. We think the will entitled to be probated.

As to the assent of the husband as affecting the disposition of personal estate of the wife by will, the true doctrine of the law seems to us to be stated by the lord chancellor in *Lloyd* v. *Hodgson*, 2 Bro. Ch. Rep. 534. To what extent the application of that doctrine may differ in this state from its application in England, on account of the difference as to the rights of the husband in reference to the personal effects of the deceased wife in the two jurisdictions, is not important now to be discussed or determined.

The judgment is affirmed.