Russell E. Colcord, by his next friend, John L. Colcord, and the St. Johns Episcopal Church of Jacksonville, Appellants, vs. Michael J. Conroy, Appellee.

Under the laws of this State the will of an unmarried woman, executed in 1884, was not *ipso facto* revoked by her subsequent marriage prior to April 5, 1891, but where such will purported to convey all of her property, and was not made in contempla-

tion of a subsequent marriage, such subsequent marriage was under our laws as they then existed, a total alteration of her circumstances, revoking the will.

Appeal from the Circuit Court for Duval County.

The facts in the case are stated in the opinion of the court.

*T. A. & B. B. MacDonell,* for Appellants.

*No Appearance* for Appellee.

CARTER, J.:

On May 3rd, 1884, Amanda M. Colcord executed a paper writing purporting to be her last will and testament, whereby she devised and bequeathed to Russell E. Colcord, her son, and to the heirs of his body, all of her "estate, real, personal and mixed, wherever found and wherever situated," with a proviso that if her said son should die without wife or issue, then the property was devised and bequeathed to the St. Johns Episcopal Church of Jacksonville, to hold to its associates and successors forever. In case her son should die, leaving a wife and no issue, the wife was to be provided for as though the property devised to her son was absolutely his. The will made no reference to any future husband or children. Mrs. Colcord subsequently intermarried with the appellee and died April 5, 1891. On June 23, 1891, this will was offered for probate before the county judge of Duval county, which was resisted by appellee upon the ground, among others, that by the subsequent marriage of the testatrix to appellee, the will was revoked. On December 21, 1891, the county judge refused to probate the will upon the ground that "the marriage of a *feme sole* revokes a will made prior thereto,

Colcord v. Conroy—Opinion of Court.

and under the laws of this State, such a will can not be probated." On appeal to the Circuit Court of Duval county, the judgment of the county judge was affirmed, the Circuit Court holding, in a written opinion, that at common law the marriage of a *feme sole* after making her will revoked that will; that this provision of the common law was adopted in this State by our statute regulating the revocation of wills, and by the general act adopting the common and statute laws of England in force at the time of the Declaration of Independence, that this common law rule was not inconsistent with our statute conferring testamentary power upon married women; that both could stand together and remain in force without conflict, in consequence whereof the will of Mrs. Colcord was annulled by her subsequent marriage to appellee. From the judgment of the Circuit Court this appeal was entered March 13, 1894, to our June term, 1894.

This case involves new, novel and important questions relating to the revocation of wills, and the conclusions we announce become, to a certain extent, rules of property. Cases involving similar questions are likely to arise very frequently in this State, and for these reasons we depart from our usual custom of affirming cases without written opinion.

1. The appellants present only one point for our consideration in their brief, *viz*: Did the marriage of Mrs. Colcord revoke her antenuptial will? It is admitted that at common law the will of a *feme sole* was revoked by her marriage. It was assumed in the court below that Mrs. Colcord was unmarried when the will in question was executed, but there is nothing in the record to show that she was not the wife of Mr. Colcord at that time. If she was, then it may be questioned whether the common law rule enforced by the lower

court had any application to the present will, as that rule only purported to deal with a will made by a woman while sole. *In re* McLarney, 90 Hun, 361.

In determining the questions which we conceive to be necessarily involved by this appeal, it will be proper to refer to certain constitutional and statutory provisions in force at the time of making the will in question, and which are still in force. By the act of March 6, 1845, it was provided that thereafter whenever any female citizen of Florida should marry, or whenever any female should marry a citizen of Florida, the female being possessed of real or personal property, her title to same should continue separate, independent and beyond the control of her husband, and should not be liable to execution for his debts, provided, however, that the property of the female should remain in the care and management of her husband; and further, that married women might thereafter become seized or possessed of real and personal property during coverture, by demise, bequest, gift, purchase or distribution; and by the sixth section of the same act it was provided that if a married woman die in Florida possessed of real or personal property, the husband should take the same interest in her said property, and no other, which a child would take and inherit, and if the wife should die without children, the husband should be entitled to administration and to all her property, both real and personal. Section 26 Article IV of the Constitution of 1868 provided that all property both real and personal of a wife owned by her before marriage or acquired afterward by gift, devise, descent or purchase should be her separate property and not liable for the debts of her husband, and this provision was continued by the Constitution of 1885—section 1 Article XI. Chap. 3249, approved February 11, 1881, provides that a married woman may dispose of her prop-

erty both real and personal, by last will and testament in the same manner as if she was not married. Section 52 of the act of November 20, 1828, provides that a devise of lands shall not be revoked by any other will or codicil, unless executed with certain formalities, but that such will may be revoked by a writing declaring same revoked or operating as a revocation thereof by law, or by burning, tearing or obliterating same by the testator or testatrix, or by his or her direction and consent, or by the act and operation of law. By the act of November 6, 1829, the common and statute laws of England of a general and not of a local nature, down to July 4, 1776, and not inconsistent with the constitution and laws of this State and of the United States, were declared to be of force in this State.

It is admitted by appellants that the statute last quoted adopted that provision of the common law which revoked the will of a *feme sole* upon her marriage, but insisted that the rule is inconsistent with the statutes regulating married women's property, and authorizing them to make wills subsequently enacted and therefore no longer of force in this State. They insist that the reasons for the common law rule, *viz*: that after marriage a woman had no power to make a will or to change or alter one previously made, having ceased to exist upon the passage of the act of 1881, the rule itself ought to cease agreeably to the rules of logic, and a maxim of the common law to that effect. Upon this principle many American courts have held that statutes securing a married woman's property to herself, and authorizing her to make wills the same as if unmarried, rendered inapplicable the common law rule under discussion, and we think the position taken by them is impregnable. *In re* Tuller, 79 Ill. 99, S. C. 22 Am. Rep. 164; Webb v. Jones, 36 N. J. Eq. 163; Noyes v. Southworth, 55 Mich.

173, 20 N. W. Rep. 891, S. C. 54 Am. Rep. 359; Will
of Ward, 70 Wis. 251, 35 N. W. Rep. 731; Morton v.
Onion, 45 Vt. 145; Fellows v. Allen, 60 N. H. 439, S.
C. 49 Am. Rep. 328; Hoitt v. Hoitt, 63 N. H. 475, 3
Atl. Rep. 604, S. C. 56 Am. Rep. 530; Emery, Appel-
lant, 81 Me. 275, 17 Atl. Rep. 68; Roane v. Hollings-
head, 76 Md. 369.    The courts in New York,
Massachusetts, Pennsylvania, and perhaps Delaware
have apparently dissented from the views ex-
pressed in the cases cited (Swan v. Hammond,
138 Mass. 45, S. C. 52 Am. Rep. 255; Blodg-
ett v. Moore, 141 Mass. 75, 5 N. E. Rep. 470; Brown v.
Clark, 77 N. Y. 369; *In re* Fransen, 26 Pa. St. 202;
Smith v. Clemson, 6 Hous. (Del.) 171); but in New York
it has also been held that the will of a *married* woman
is not revoked by her subsequent re-marriage (*In re* Mc-
Larney, 90 Hun, 361), thus showing that the New York
courts are holding to the strict letter of the common
law rule.   If the marriage of a woman has such a bane-
ful effect upon a will made by her while competent to
make it, it would seem that a will made by a married
woman, if not void because of her coverture, when made,
would at least be revoked by her subsequent remarri-
age.   In the Delaware case the will was made prior to
the enactment of the statute empowering married wo-
men to make wills, and the court held that the statute
not being retrospective, could have no effect upon a will
previously made.   In New York, Massachusetts and
Pennsylvania, as will be seen by reference to the cases
cited, there were express statutes providing that the will
of a *feme sole* should be revoked by her marriage, and
the courts did not feel at liberty to disregard these ex-
press statutes; holding that they had not been repealed
by the subsequent ones enabling married women
to own and to convey property by will.   They also

held that an express statute enacting the language of a common law provision was not repealed by another statute rendering inapplicable the original reasons for the common law rule; because a statute regularly passed need not necessarily be supported by a good reason for its enactment, or for its continued application. There is much force in the argument, when applied to legislative enactments, and it also has application, but to a more limited extent, to rules of the common law. The nature and origin of a great majority of the common law rules show that they were and are founded in reason and justice, and they were and are the result or consequence flowing from the application of those fundamental principles of justice, common sense and legal reason, supposed to be common to all societies and nations. The common law purports to be the perfection of reason. One of its maxims is, that when the reason ceases, the law ought also to cease, and it was frequently applied to remove from some particular rule cases which in reason and justice, because of legislative enactments or otherwise had ceased to fall within its reason. The proposition that the marriage of a *feme sole* revoked her previous will was not an absolute, independent and inflexible rule of the common law, like a declaration to that effect by parliament, but it was a result or consequence obtained by applying to the case of a married woman, as it then existed, certain common law principles; and independent of those principles it had and could have no separate standing without an act of parliament. To illustrate: at common law, a single woman, whether maid or widow, had full power to make a valid disposition of her property by will, in the same manner, to the same extent and with like effect, as a man of similar age and memory. Her power in this respect was suspended merely—not annihilated—during

coverture; and so soon as the cause of suspension—her coverture—ceased, the power was immediately available to her, nor did it suffer the slightest temporary or permanent diminution by its suspension. Her power to make wills being suspended during coverture, her power to alter or change one already made was likewise suspended. There was also a rule applicable to all wills *viz*: that they should remain ambulatory, which inhered in and was a part of the nature of such instruments. Applying the common law principles of reason and justice to this condition, we find that the woman having no power to change an instrument, which in its nature must remain changeable, it is therefore void, or, in technical language, revoked. Now the principles upon which this result rests are not repealed by an act relieving the will of a married woman from their operation or application; they still remain a part of the common law, applicable to all cases, which may now or hereafter fall within their purview. There is a diversity of opinion as to the particular reason for the common law rule under discussion. There is none, however, that the rule was a result of her coverture. The suspension of her power to make wills resulted from a rule applicable only to coverture, *viz*: that practically all the woman possessed became her husband's upon marriage, and her separate existence was for the time being practically merged in that of her husband. No matter what particular reason be assigned for the rule under discussion, whether because for the time being the woman was so far dominated by the husband, that she was mentally or physically incapable of exercising the faculties of a free moral agent, or because she had no separate existence, or because by permitting her to make a will she could defeat her husband's marital rights, or because she could own no property to be disposed of by will, or because her

separate existence was not recognized by the law, they are all based solely and exclusively upon the fact of coverture, and according to that same law, when coverture ceased, the woman emerged therefrom with every faculty restored, every element of duress removed, with the same capacity to acquire and dispose of property renewed, and with all disabling responsibilities and duties imposed upon her by the marriage annulled. Why, then, does not the same result follow as to the *testamentary capacity and power* of a married woman, under our legislation enabling her to acquire and own property, and to dispose of same by will, in the same manner as if she was unmarried? In so far as testamentary capacity is concerned, the married woman under these statutes is not the married woman of the common law. The common law never declared what effect the marriage of a woman, who before, *during* and after marriage could own property and dispose of same by will, would have upon her antenuptial will. If we should declare that by the common law the present married woman's antenuptial will was revoked by her marriage, we should be doing what the common law never did. Under the law she had power to execute the will or to change it up to the moment before she was married. Our statute says that she shall have the same power the moment after and during the existence of the marriage. It says the powers which the woman possessed before marriage in this respect shall not be suspended, but shall remain notwithstanding coverture. Upon this state of facts, applying the fundamental principles of the common law, can it be doubted that the old rule has no application to this new case? We believe we are adhering to the true principles of the common law when we say that it does not.

2. In this case the will purported to convey all of

Mrs. Colcord's property; it was not made in contemplation of marriage; and subsequent to its execution the testatrix intermarried with appellee. Was the will revoked under these circumstances? We must again refer to common law principles, because we have no statutory rule upon the subject, other than the declaration *supra*, that a will may be revoked by the act and operation of law. There were certain principles applicable to all wills, and one rule deduced therefrom was that the law annexes to every will of an unmarried man, a condition that it shall stand revoked if, between the date of his will and the date of his death, there shall be a total alteration of his circumstances which causes new moral duties and obligations not foreseen or provided for by the will; and this condition is annexed in all cases where the will disposes of the whole of the testator's property, without thought and in disregard of those persons having claims upon his bounty by reason of those new moral duties and obligations. And marriage and the birth of a child subsequent to making the will was uniformly held to constitute *sufficient evidence* of a total alteration of circumstances to effect a revocation of the will in accordance with the implied condition. Christopher v. Christopher, 2 Dick. 445; Jackson v. Hurlock, 1 Amb. 487; Lancaster v. Lancaster, 5 Term Rep. 49, and Shepherd v. Shepherd, *Ibid*, 51 n.; Kenebel v. Scrafton, 2 East, 529; Johnston v. Johnston, 1 Phillimore, 447; Marston v. Roe, Ad. & Ellis, 14; *Ex parte* Ilchester, 7 Ves. Jr. 348; Sheath v. York, 1 Ves. & B. 390; Belton v. Summer, 31 Fla. 139, 12 South. Rep. 371. See Brush v. Wilkins, 4 Johns. Chy. 506, for a review of the English cases by Chancellor KENT up to 1820. This rule depends not upon any ancient rule of the common law, nor upon positive enactment by legislative authority; it was borrowed from the Civil law, and is

Colcord v. Conroy—Opinion of Court.

the result of decisions of the English courts founded upon principles of substantial justice and reason. Some of the English cases held that marriage alone was not sufficient evidence of the alteration of a testator's circumstances, because the wife could provide by a marriage contract against the negligence or injustice of her husband, and at all events the law provided for her by means of dower, regardless of any will made by the husband; others held that the birth of a child alone was not a total change of circumstances, because the circumstances of a married man were not altered by the birth of a child or more children and he was presumed to have taken into consideration the possibility of the birth of more children, when making the will. Sheppard v. Sheppard, *supra*; Parsons v. Lanoe, 1 Ves. 189; Johnston v. Johnston, 1 Phillimore, 447; Brush v. Wilkins 4 Johns. Chy. 506. On the other hand, it was well settled that a subsequent marriage, and coming into being of some person as a result of marriage, who had a natural, moral and legal claim upon the testator's bounty— a child—was a total alteration of the testator's circumstances, whereby the will was revoked by operation of law. The condition was one implied by law in favor of those who came into existence subsequent to the execution of the will, having a natural, moral and legal claim upon the testator, who were not provided for by the law, despite the will, and who were not in the mind of the testator at the time of making the will. Lancaster v. Lancaster, 5 Term Rep. 49; Sheath v. York, 1 Ves. & B. 390. If we apply these principles to the present will, the result will be the revocation thereof, because when the testatrix married she acquired not only a husband, but an heir as well; or, more properly speaking, subsequent to the execution of the will, the testatrix married, and there came into existence as a result of mar-

riage one who had a natural, moral and legal claim upon her bounty, and who, upon her death intestate, would have inherited equally with any child, or the whole of her property if there were no children. Section 6 act of March 6, 1845, *supra*; McDougal v. Gilchrist, 20 Fla. 573; Bailey v. Finlayson, 25 Fla. 153, 6 South. Rep. 157; Coogler v. Rodgers, 25 Fla. 853, 7 South. Rep. 391. There was, therefore, a total alteration of her circumstances between the date of her will and the date of her death, which was not foreseen at the time of making the will. It is true these principles were never, at common law, applied to the wills of women, because by that law a woman's will was revoked by her marriage upon other principles which we have seen no longer apply. But the fundamental principles of the common law are both perpetual and elastic, applying to all cases, new as well as old, falling within their scope; and ceasing to apply whenever a particular case is removed from their purview. We, therefore, hold that the will of Mrs. Colcord, under the circumstances of this case, was revoked by her subsequent marriage, and that the judgment of the court below, though based upon reasons inapplicable to the present case, was correct. In this conclusion we are sustained by the following authorities: Tyler v. Tyler, 19 Ill. 151; *In re* Tuller, 79 Ill. 99. S. C. 22 Am. Rep. 164; Morgan v. Ireland, 1 Idaho, 786; Brown v. Scherrer, 5 Colo. App. 255; 38 Pac. Rep. 427; Scherrer v. Brown, 21 Colo. 481, 42 Pac. Rep. 668. See, also, *In re* Kaufman, 131 N. Y. 620, 30 N. E. Rep. 242; Garrett v. Dabney, 27 Miss. 335; Milburn v. Milburn, 60 Iowa, 411, 14 N. W. Rep. 204.

The decree of the court below is affirmed.