## ALABAMA & VICKSBURG RAILWAY CO. *v.* NEWTON JONES.

1. IGNORANCE OF THE LAW. *When it excuses.*

> The maxim that ignorance of the law does not excuse (*ignorantia juris haud excusat*), has reference only to the general law, and cannot properly be applied to ignorance of one's personal private right, under the law, arising out of existing facts.

2. SAME. *Release. Instructions. Modification by the court.*

> Where, in an action brought by an ignorant man of humble station against a railway company for personal injuries resulting in the loss of a limb, the defendant relies on a release, in writing, executed by the plaintiff very soon after the injury and amputation, which there is evidence going to show was procured while the plaintiff, from pain and the effects of opium, was incapable of acting rationally; and there also being evidence that the plaintiff knew nothing of the settlement for about two weeks, and when told of it consulted with his friends, who, with his wife, shortly afterwards secured legal counsel; that he remained in bed about two months, and spent all the money paid him in settlement, but several months afterward, through his attorneys, tendered the amount back to defendant; and the plaintiff has asked an instruc-

tion predicated of the evidence going to show the alleged imposition, and to the effect that he was not bound by the settlement "unless he concluded to treat it as final after being fully informed of all the facts," it is not erroneous for the court below to modify the instruction by inserting after the word "facts" the words "and of his rights in the premises."

3. SAME.

Where, in such case, the defendant has asked an instruction to the effect that if the plaintiff, after regaining the use of his faculties, and becoming conscious of having signed the release, and "informed of its nature and character," and of his having received the money from defendant in consideration thereof, did not promptly disaffirm the contract, but used and appropriated it for himself and family, such conduct was acquiescence, and that the jury should find for the defendant even should they believe that the plaintiff was originally entrapped into making the contract, it is not erroneous for the court below to modify such instruction by inserting after the words "was informed of its nature and character," where used as above stated, the words "and of his right to disaffirm it and be restored to his original right."

4. SAME.

Where, in such case, the defendant has asked an instruction to the effect that there were two questions for the jury to settle as to the release (1. Was the plaintiff mentally capable of contracting when he signed it?  2. Did he expend the money paid to him after he became conscious of the source from which he obtained it, and after "he was capable of understanding the nature and consequences of the contract he had made?"), and that if on either proposition their answer should be in the affirmative, they should find for the defendant, it was not erroneous for the court below to modify the instruction by inserting after the words "he was capable of understanding the nature and consequences of the contract he had made" the words "and of his right to annul and repudiate it."

5. RAILROADS. *Kicking switches. Contributory negligence. Code* 1892, § 3548, *construed.*

Section 3548, code 1892, prohibiting running, flying, walking, or kicking switches within the limits of a municipality, and making a railroad company liable for damages sustained thereby "without regard to mere contributory negligence of the party injured," imposes no liability where the injury results from the voluntary, deliberate, wilful, and reckless exposure of the person injured, ·

but does impose liability where the negligence consists in the want of ordinary care in the situation that has arisen, and is such as usually and ordinarily contributes proximately to the injury, and without which it would not have occurred.

FROM the circuit court of the first district of Hinds county. HON. J. B. CHRISMAN, Judge.

This was an action brought by Newton Jones against the defendant railway company for personal injuries caused by the act of its servants in making a "kicking switch" within the municipality of Jackson, the car thus switched having run over and crushed one of his feet in such manner as to necessitate amputation. The plaintiff, an ignorant negro of advanced age, was standing upon or going across the switch track of defendant at the time of the injury, and the attendant circumstances may be said to have been such as indicate want of ordinary care on his part.

Section 3548, code 1892, which, on a former appeal herein, was held to be a valid exercise of the police power of the state in the regulation of railroads (72 Miss., 22), is as follows: "It shall not be lawful for any railroad company or other person to switch a railroad car in the manner commonly known as a 'flying,' 'running,' 'walking' or 'kicking' switch, within the limits of a municipality; and, in case of injury resulting to any person or property from switching in violation of this section, the railroad company shall be liable in damages, without regard to mere contributory negligence of the party injured."

The defendant relied on a release in writing, executed by the plaintiff on the day but one after he received the injury, and within twelve hours after the amputation of his foot, and the testimony of persons present at the settlement to the effect that it was fairly entered into, and with full knowledge of its nature on the part of the plaintiff, together with the fact that the plaintiff had spent all of the money paid to him in settlement, from which last circumstance it was insisted that acquiescence and ratification were deducible. On behalf of the plaintiff

there was evidence that he knew nothing of the settlement for about two weeks, having been, at the time it was made, stupefied from pain and the effects of opium; that, when told of it, he at once said he would not have made it but for his mental incapacity from the causes stated; that he then, as soon as possible, consulted with his white friends, and employed an attorney; that he remained in bed for about two months, but several months after the injury, and after he had spent the money received in settlement, tendered the amount back to the company. The evidence was conflicting in many respects, and particularly so as to the manner in which the car that injured plaintiff was switched.

Among others, the following instruction for the plaintiff was given: "5. The court instructs the jury that, if they believe from the evidence that the agents of defendant who procured the release knew that plaintiff, on account of prostration from suffering or the stupefying effects of drugs administered for his release from pain, was not in a condition to consider, weigh and understand any business proposition or transaction, and that defendant's agents, desiring to take advantage of, surprise and overreach plaintiff, then came to his bedside, and obtained a settlement and release, and that the plaintiff did not, and could not, weigh, consider or understand the nature, scope and meaning of the same, and was not in a rational state of mind, then such conduct and procurement would be fraudulent, and plaintiff would not be bound by the settlement, unless, after being fully informed of all the facts and of his rights in the premises, he concluded to treat it as a final settlement, notwithstanding such imposition upon him." The words "and of his rights in the premises," were a modification of the instruction as asked by the plaintiff, and were inserted by the court of its own motion.

Among the instructions given for the defendant was the following: "6. If the jury believe, from the evidence, that the plaintiff, while in the possession of his mental faculties, or

while he understood what he was doing, became conscious that he had signed the release and was informed of its nature and character and of his right to disaffirm it and be restored to his original right, and that he had received the money in consideration therefor from the railroad company, did not promptly disaffirm the contract, but used and appropriated the money received for himself and family, this is an acquiescence, and you will find for the defendant on the release, even though you should believe he was originally entrapped into making the contract.''

The words ''and of his right to disaffirm it and be restored to his original right'' were a modification of the instruction as asked by defendant, inserted by the court of its own motion and over defendant's objection.

Another instruction given for defendant was the following: ''7. There are two questions for the jury to settle as to the release: (1) Was the plaintiff mentally capable of contracting when he signed it? and (2) did he expend the money paid him after he became conscious of the source from which he obtained it, and after he was capable of understanding the nature and consequences of the contract he had made, and of his right to annul and repudiate it? If, on either proposition, your answer be in the affirmative, you will find for the defendant.''

The words ''and of his right to annul and repudiate it,'' were a modification of this instruction as asked by defendant, inserted by the court below of its own motion and over the objection of the defendant. The verdict being for the plaintiff, and defendant's motion for a new trial having been overruled, this appeal was prosecuted.

*Nugent & Mc Willie,* for the appellant.

The fifth instruction for plaintiff should not have been given. There was no evidence to sustain that part of it relating to the knowledge of the defendant's agents that plaintiff was not in a condition to understand any business proposition on account of

prostration from suffering or the stupefying effects of drugs administered, and that defendant's agents desired to surprise and overreach him. This portion of the charge makes what the agents desired, as to which there was no evidence, a pregnant circumstance going to vitiate the settlement, and the jury was left to infer from the fact of settlement the desire to over-reach and defraud. No matter what the defendant's agents may have desired to accomplish, this is really what they did and said. There was no representation made, no false statement. The claim agent simply told the plaintiff he had come to make the settlement, and, when the settlement was made, further told him, before leaving, that if he was not satisfied, to signify the fact and the whole transaction might then be undone, and such right of action as he had be restored to him. About this matter the plaintiff affected entire ignorance, but his wife, who stated nothing in contradiction of this testimony, says the plaintiff did not think $200 enough, and insisted on $300, and that, when the last mentioned sum was agreed on, she took the $50 paid in cash and the agent's due bill for $250, retaining the due bill until the balance of the money was paid. One may desire to do an improper thing, but unless this desire finds expression in overt acts, no human law can condemn it or make it the basis of rescinding a contract.

The statement is made in the charge that a release obtained under the circumstances stated would be fraudulent. But this cannot be proper, for there is no predicate of fraud in the acts of defendant's agents. They committed no fraudulent acts and made no fraudulent representations. If the release can be avoided, it must be on the single ground that the plaintiff, when he executed the release, did not and could not weigh, consider and understand the nature, scope and meaning of the same, and was not in a rational state of mind. That might furnish ground for a practical rescission by the return of the money and a prompt disaffirmance of the contract. The real inquiry was whether, at the time of making this release, the

plaintiff was capable of understanding and intelligently consenting to it, not because of imbecility, but stupefaction from opium, and the mere desire on the part of defendant's agents "to take advantage of, surprise and overreach him," could not, in any way, affect his state of mind. There is a manifest difference between this case and one in which the release is effected through fraud or fraudulent representations. In the one case the release is voidable; in the other, void *ab initio*. In the one case the releaser can rescind, if, when fully informed of the facts, he disaffirms the settlement and returns the money; in the other he need not return or offer to return the money. *Railroad Co.* v. *Mills*, 11 Eng. & Am. Ry. Cases, 132; *Railroad Co.* v. *Lewis*, 19 *Ib.*, 225; *Bliss* v. *Railroad Co.*, 9 Am. Ry. Corp. Cases, 485; *International, etc., Railroad Co.* v. *Brazzil*, 14 S. W. Rep., 609, s.c. 78 Tex., 314.

But a graver objection to this charge is found in the last clause: "Unless, after being informed of all the facts and of his rights in the premises, he concluded to treat it as a final settlement, notwithstanding such imposition upon him." This is tantamount to saying that he must have been advised by counsel of the law of the given case, and fully informed of his rights, and presupposes imposition. If this rule be true, there could never be a settlement without the presence and advice of counsel, and if the lawyer made a mistake, it would not be binding. We have always understood that everyone is presumed to know the law, and that this presumption follows him in all his transactions. The charge reads, "fully informed of all the facts, and of his rights in the premises." Had it been restricted to the facts, it might not have been objectionable.

According to the testimony of all the witnesses for the defendant, the plaintiff was perfectly sane when both the first and second release were executed, and insisted on more than was offered to him, and, according to his statement he was not, but he was the only person aware of the negative fact. Within the next two weeks he was informed of all the facts, and he

says he was mad; but he went along and spent the money, and only thought of suing when some time afterwards he was fully informed of his rights by his attorney. The extent of this information seems to have been that the defendant had not paid him enough. The charge placed the burden on the appellant to show that the defendant was fully informed of his rights in the premises when no such duty devolved upon it, and nowhere in the pleading does a suggestion occur that the plaintiff was not informed of his rights.

Upon the same principle rests the objection to the court's modification of defendant's sixth instruction by interpolating in it the words, "and of his right to disaffirm it and be restored to his original right." The charge must be read in connection with the evidence, and the sole defense was that the plaintiff did not know what he was doing when the release was executed, which the charge presupposes to be the fact. He simply denies all knowledge of the occurrence. It is true there was no evidence that the plaintiff was informed of his right to disaffirm the settlement and be restored to his right until his case had been put into the hands of a lawyer, but he did know he had been injured, and, also, in a very short time thereafter knew that the defendant had paid him $300, and on what account it had been paid; and, although mad about the settlement, as he says, went right along and spent the money. If the view of the court prevail, no settlement could ever be upheld; for it would be necessary for the company to inform the plaintiff of his right, and for some one to volunteer information while he was using the money. The charge should have been given as asked, and without the modification inserted by the court.

The court's modification of the seventh instruction asked by defendant is of the same nature, and equally objectionable. The court makes the charge include the idea that the plaintiff must have been informed as to his legal right to annul and repudiate the contract. But who was to inform him? Would his ignorance of law, in a court of law, excuse him? Must the

defendant, relying upon a release acquiesced in from known facts, go beyond these, and must it be assumed that the right "to annul and repudiate" the contract existed upon the evidence before the jury? The jury could, without any evidence, and left to their will, assume that the old negro knew nothing about the law applicable to his case. Indeed, they could go further, and declare that very few lawyers thoroughly know the law; but this could hardly be invoked as a safe rule of human conduct or for the administration of justice. Necessarily, we are all presumed to know the law and our rights under it, or we could not long exist as a civilized community.

The court below should have granted the first instruction asked by defendant. It presents our construction of § 3548, code 1892, and we adopt the rule announced in *Welsh* v. *Railroad Co.*, 70 Miss., 25. The proposition is that, even if the defendant was making a kicking switch, the plaintiff could not, "by a reckless or wilful disregard of the ordinary means of protection, invite an injury suffered in consequence." In other words, where there is something more than "mere contributory negligence," the statute finds no application. The character of the evidence makes it inferable that the court below construed the law as imposing absolute liability by way of penalty for its violation. That cannot be true. The defendant might be bound for its own wrong, but could hardly be held because of the reckless or wiful act on the part of another. The question is lucidly discussed in *Taylor* v. *Lake Shore R. R. Co.*, 45 Mich., 74 (40 Am. Rep., 457), and in *Bott* v. *Pratt*, 33 Minn., 323 (53 Am. Rep., 47). In neither of these cases is the wrongful or imprudent or reckless act of the plaintiff ignored. See, also, Cooley on Const. Lim. (5th ed.), pp. 715, 716 and notes.

*Williamson & Potter*, for the appellee.

The objections urged to the first instruction granted the plaintiff, including the court's modification thereof, and to the

court's modification of defendant's sixth and seventh instruc-
tions, present but one question, and that question was solved
in favor of the plaintiff on the former appeal herein.   In the
case there presented, the plaintiff admitted that he and his wife
had expended the money, and this fact was carefully weighed
and considered by the court at that time, and it was held that
it was a question of fact for the jury to determine from all the
evidence in the case, whether in point of fact the release had
been ratified, the court saying further that, if what appellee
and his wife say be true, the release is utterly. void.   As asked,
the sixth and seventh instructions for defendant did not present
the law.   The expenditure of the money would be only a cir-
cumstance in the case tending to show a ratification, and not
*per se* a ratification; and, unless plaintiff's purpose was to rat-
ify the void contract, it would amount to nothing.   We are
unable to see how, where a party retains the money paid under
a void or voidable contract, and, holding to that so received,
should make further demand by suit, without making a tender
of what had been received, taking the chances of success with-
out risk, would have a stronger case than where the money,
through necessity or improvidence, had been expended, and
expended without knowledge of his rights, etc., yet, before
suit, tender all that had been received, honestly endeavoring to
place the adverse party *in statu quo* before trial.   We think
this about the rule in *Simonton* v. *Bacon*, 49 Miss., 582.
Again, it could only be considered as evidence tending to show
a ratification, because the law does not require the identical
money to be tendered that had been received.   In the cases
cited by this court—to wit: *Llewellen* v. *Evans*, 1 Cox, 333;
*Bean* v. *Railway Co.*, 107 N. C., 731; *Mullen* v. *Railway Co.*,
127 Mass., 86; *Railway Co.* v. *Doyle*, 18 Kan., 58—it was
held that no tender was necessary, and this court indorsed that
view on its former decision herein.   72 Miss., 22.  ·

Appellant's first charge was properly refused, because there
was no evidence in the case tending to show, or that would

justify the assumption, that appellee wilfully placed himself
in a position to be injured.  Fairly considered, the evidence
shows reasonable care under the circumstances, but, if strained
to the utmost and antagonistic to appellee, it would be nothing
more than mere contributory negligence.  And, again, this
instruction was properly refused for another reason.  Under
the evidence and under § 1808, code 1892, the burden of proof
was on the defendant.  There is nothing in the case causing the
burden to shift.

WHITFIELD, J., delivered the opinion of the court.

The fifth instruction for the plaintiff was in these words:
"The court instructs the jury that, if they believe, from the
evidence, that the agents of defendant, who procured the re-
lease, knew that plaintiff, on account of prostration from suffer-
ing, or the stupefying effects of drugs administered for his re-
lease from pain, was not in a condition to consider, weigh and
understand any business proposition or transaction, and that
defendant's agents, desiring to take advantage of, surprise and
overreach plaintiff, then came to his bedside, and obtained a
settlement and release, and that the plaintiff did not and could
not weigh, consider or understand the nature, scope and
meaning of the same, and was not in a rational state of mind,
then such conduct and procurement would be fraudulent, and
plaintiff would not be bound by the settlement, unless, after
being fully informed of all the facts, and of his rights in the
premises, he concluded to treat it as a final settlement, not-
withstanding such imposition upon him."  The words, "and
of his rights in the premises," were a modification by the court.
The court also modified the sixth charge given for the defend-
ant by inserting after the words "was informed of its [the
release's] nature and character," the words "and of his right
to disaffirm it, and be restored to his original right."  And in
the seventh instruction for the defendant the court inserted
after the words "he was capable of understanding the nature

and consequences of the contract he had made," the words
"and of his right to annul and repudiate it."

It is insisted that these modifications were erroneous and
were in the face of the maxim, "*ignorantia juris haud ex-
cusat.*" The instructions should all be viewed together as a
whole, and, thus viewed, looked at, further, in the light of the
particular case made by the facts. If the modifications of these
instructions meant (what it is insisted they mean) that the plain-
tiff should not have been presumed to know "the general law
of the land"—the sense in which the word "*jus*" is used in
the maxim—undoubtedly the modifications were erroneous.
Mr. Pomeroy says (2 Pom. Eq. Jur., § 841): "Mistake of
law may be on ignorance or error with respect to some general
rules of the municipal law applicable to all persons, which
regulate human conduct, determine rights of property, of con-
duct and the like—such as the rules making certain acts crimi-
nal, and those controlling the devolution, acquisition or trans-
fer of estates, and those prescribing the modes of entering into
agreements. On the other hand, the term may mean the ignor-
ance or error of a particular person with respect to his own
legal rights and interests which are affected by, or which result
from, a certain transaction in which he engages." And in
section 842 he says the maxim has "no application to the mis-
takes of persons as to their own private legal rights and inter-
ests." And in section 849 he tells us the reason of the distinc-
tion is that "a private legal right, title, estate, interest, duty,
or liability is always a very complex conception. It necessarily
depends so much upon conditions of fact that it is difficult, if
not impossible, to form a distinct notion of a private legal
right, interest or liability, separated from the facts in which
it is involved and on which it depends. Mistakes, therefore,
of a person with respect to his own private legal rights and
liabilities, may be properly regarded—as in great measure they
really are—and may be dealt with, as mistakes of fact." See,
further, sections 841–850, and the notes, with the authorities.

We have most carefully examined the authorities on this distinction, and, without burdening this opinion with quotations, feel no hesitancy in saying it is clearly shown and most abundantly established by the highest authority.   We append a few of the authorities.   See, especially, *Blakeman* v. *Blakeman*, 39 Conn., 320, a strong and very striking case; 1 Wharton on Contracts, §§ 198–201, specially § 199;  Pollock on Contracts (1st Am. from 2d Eng. ed.), pp. 446–448, and notes a, b, page 448;  Clarke on Contracts (ed. 1894), p. 306, and the authorities in notes 40, 41; *Toland* v. *Corey*, 6 Utah, 396 (the court saying, as to the maxim, "It is only applicable when the mistake is as to the general law, not to a case where a party is mistaken as to the effect of existing circumstances in relation to his private rights"); *Griffith* v. *Sebastian Co.*, 49 Ark., 24; *Wilson* v. *Md. Life Ins. Co. of Baltimore*, 60 Md., 150; 1 Beach on Mod. Eq. Jur., §§ 37, 38; *Macknet* v. *Macknet*, 29 N. J. Eq., 54;  1 White & T. Lead. Cas. Eq., part 2, English notes at top of page 825, American notes on page 830.   And see, as illustrative, *Vasse* v. *Smith*, 1 Am. Lead. Cas., p. 310; Lawson on Contracts (ed. 1893), § 144; *Fetrow* v. *Wiseman*, 40 Ind., 156: *Flexner* v. *Dickerson*, 72 Ala., 322; *Owen* v. *Long*, 112 Mass., 404;  and, especially, the exhaustive note to *Craig* v. *VanBebber* (Mo. Sup.), 18 Am. St. Rep., at top of page 706 (13 S. W., 906), the author noting a distinction in the application of the rule under discussion in this illustrative class of cases to the case where a disability has been removed. *Hunt* v. *Rousmaniere*, 1 Pet., 1.

We think the modifications of these instructions fall within this distinction, and not within the general rule.   When the court charged that appellee should be informed of "his right in the premises," of "his right to disaffirm and be restored to his original right," and of "his right to annul and repudiate the release," it did so in charges presenting this concrete case on all its facts, and meant merely that he should, after being informed of the facts attending the execution of the release and

subsequent thereto, up to the time he was competent to act, be informed, also, or know, of his personal, private right, arising out of these facts, existing when he was called upon to ratify or repudiate, to repudiate it.   He had a right to know these facts, and also their effect upon his right to repudiate the release voidable for fraud.   We think this is, manifestly, the fair meaning of these modifications, and they were not, therefore, erroneous.

The verdict of the jury must be accepted as a finding both that appellee was guilty of no wilful and wantonly reckless conduct, and that the car was ''kicked.''   The statute does not mean that one who wantonly puts his foot on a rail, to have it cut off by a kicked car, can shelter himself under its terms by saying contributory negligence is no defense.   The negligence which usually and ordinarily contributes proximately to the injury, without which the injury would not have occurred, consisting in the want of ordinary care in the situation, is what is meant by the statute, not the voluntary, deliberate, wilful, reckless exposure of one's self to injury.   We find no error.

*Affirmed.*

*Nugent & McWillie,* for the appellant, filed the following suggestion of error:

This was not an action for a deceit practiced upon the plaintiff, nor was it, like the cases cited by the court in its opinion, a proceeding in equity.   Pomeroy seems to be the founder of the view adopted by the court as to the ignorance of the law that will excuse.   Eq. Juris., §§ 842, 849.   It is not difficult to get at the author's meaning on reading all that he has to say on the subject.   He is discussing a well-known, well-recognized and unbending maxim of the law, and the jurisprudence of equity in reference to it, often invoked to mitigate its rigor. As to this, he draws the distinctions which attracted the attention of the court, and especially refers, in the footnote, to Plowden for an announcement of the rule at law: ''It is pre-

sumed that no subject of the realm is miscognizant of the law whereby he is governed. Ignorance of the law excuses none." He follows the statement of the rule in its primary signification by a distinct reference to the " two species in equity contained in the second class," which, he says, " are mistakes as to individual legal rights " (§ 841). He concedes that a mistake of law, pure and simple, is not ground for equitable relief, and illustrates it by a reference to the leading case of *Bilbi* v. *Lumley*, 2 East, 469, where an insurer, with knowledge of all the facts which destroyed his liability on a policy of insurance which he had signed, but in ignorance of the legal rights resulting from these facts, paid the amount he had insured, and afterwards brought an action to recover back the money as paid under a mistake. The court held that the action could not be maintained. Lord Ellenborough said: " Every man must be taken to be cognizant of the law, otherwise there is no saying to what extent the ignorance might be carried. It would be urged in almost every case." Note 1, p. 304, § 842. The cases in equity sustaining this declaration are almost innumerable. There must be other circumstances connected with the particular transaction which bring it within one or the other of the recognized grounds for equitable intervention, as determined in *Bank of United States* v. *Daniel*, 12 Peters, 56, a case in equity. In *Hunt* v. *Rousmaniere's Admr.*, 1 Peters, 15, the court said: " We hold the general rule to be that a mistake of this character is not a ground for reforming a deed founded on such a mistake; and, whatever exceptions there may be to this rule, they are not only few in number, but they will be found to have something peculiar in their characters."

We would offer a deferential dissent from the interpretation given to sections 841 and 842 of Pomeroy's Equity Jurisprudence. In the former he is merely referring to the distinction in the classes of cases where the assumed ignorance of the law may appear. In the second class he embraces cases in which there may be the ignorance or error of the particular

person with respect to his own legal rights and interests which are affected by, or which result from, a certain transaction in which he engages. Later on in the same section he says this application of the term may present two entirely different conditions, one of which is where the person to enter "into the transaction may be ignorant of, or mistaken about, his own antecedent legal rights and interests which are to be affected by what he does, although he correctly apprehends and fully understands the legal import of the transaction itself and its true effects upon his supposed legal rights." In the footnote he says: "Compromises are the most common illustration of this species, where the parties correctly understand the legal effect of the agreement itself which they make and of the instruments which they execute, and the mistake consists of their ignorance or error as to the nature of the prior legal rights which they possessed, and which they surrender by means of the compromise. It will be found, I think, that a great majority of the cases in which mistakes of law have been relieved belong to this species." He is only here stating a general proposition for subsequent discussion. In section 842 he does not state that the maxim has "no application to the mistakes of persons as to their own private legal rights and interests," but that judges of the highest ability have so remarked in disposing of certain cases before them, and refers us in footnote 1 to the case of *Cooper* v. *Phibbs*, L. R., 2 H. L., 149, 170, in which Lord Westbury spoke of a private right of ownership as a matter of mistake of fact. "It may be the result also of a mistake of law, but if the parties contract under a mutual mistake and misapprehension as to their relative and respective rights, the result is that the agreement is liable to be set aside as having proceeded upon a common mistake." The language of the judge had reference exclusively to the case before him. He also refers in the note to the case of *Lansdowne* v. *Lansdowne*, 2 J. & W., 205, where the owner of land, through a mistake and misapprehension of law, brought about by a com-

mon adviser, conveyed away his property.   The parties acted
upon his mistaken view, and not their own.   As limited in its
application to this kind of case, the general rule in equity may
prevail.

In § 843, the learned author actually discussed the excep-
tions to the rule, which, in § 842, he tells us certain judges had
announced, as *obiter dicta* in cases to which they had no special
reference, as he shows in the note above referred to, quoting
the words of Lord Westbury.   We are here informed, how-
ever, that the exception or rule noted "is not, in its full ex-
tent, sustained by authority; indeed, a portion of its conclu-
sions is directly opposed to the overwhelming weight of judi-
cial decisions."   He also informs us in what this opposition
consists: "The rule is well settled that a simple mistake by a
party as to the legal effect of an agreement he executes, or as
to the legal result of an act which he performs, is no ground
for either defensive or affirmative relief."   This well-settled
rule, even in equity, would necessitate a reversal of this court's
judgment.   With knowledge of the fact that he had released
the defendant, and that the money he had was paid to him as
the consideration therefor, Jones used and spent the money re-
ceived.   Now, he may have been ignorant "as to the legal re-
sult of this act," or the successive acts of this character, but,
according to Pomeroy himself, it is "no ground for defensive
or affirmative relief."   He had, by his acts, ratified the re-
lease which he had the right to avoid on the facts set up in his
replication to the plea.

WHITFIELD, J., delivered the opinion of the court in response
to the suggestion of error.

The point with respect to the pleadings, now earnestly pressed
upon the court, was only incidentally referred to on the former
argument of the cause, and, we think, with good reason, for
the rejoinder to the first replication to the defendant's second
plea distinctly put in issue the validity of the alleged ratification,
and the rebutter thereto traversed it.

On the modifications of the charges by the court, we are satisfied, after a careful re-examination of the authorities, we announced the correct rule in our former opinion. The authorities are not confined to cases in equity.

The right which one has to nullify an alleged ratification by him of a voidable release executed by him, by showing that when he was alleged to have so ratified, he was not aware of his private legal right arising out of the facts, to repudiate such release, is a substantive right, and not the mere rule by which a court of chancery administers his right; and, as such substantive right, it is available in avoidance of such alleged release, as well at law as in equity. If such person filed his bill to cancel an alleged written ratification, on such ground, all that the court does is to cancel and annul the alleged written ratification, so that it shall not form the basis for the assertion of any right resulting therefrom to the party holding it against the person filing the bill. When such person is allowed to show at law want of knowledge of such private legal right to repudiate the release, the same end is accomplished, the proof cancels and annuls the alleged written ratification. It is the same substantive right, inhering in the very truth and justice of the case administered in both instances—administered in one form in one forum and in another form in another. Here the ratification alleged rests wholly in parol. How is the party seeking to be relieved to cancel, by bill in equity, an alleged parol ratification?

*Suggestion of error overruled.*