SMITH *et al v.* MUSE *et al.**

[103 So. 356.    No. 24802.]

(Division A.    March 30, 1925.)

EQUITY. *Title acquired against guardian by possession for ward under mistake of law, equity affording no relief in such cases.*

Where, under mistake of law as to the effect of a will, induced by advice of counsel, a guardian, though owner of land, holds it for the ward for the statutory period, disclaiming any interest in herself, title is effectually vested in the ward; equity not relieving where a party mistakes the law as to his private legal rights.

*Headnote 1. Equity, 21 C. J., section 69.

APPEAL from chancery court of Madison county.

HON. V. J. STRICKER, Chancellor.

Suit by J. P. Smith and others against E. W. Muse and others. From adverse decree, complainants appeal. Affirmed.

See, also, 134 Miss. 827, 98 So. 436.

*H. B. Greaves,* for appellants.

The only question here involved is, does the fact that Mrs. M. P. Muse, who was the true owner of the land, by inheritance from her husband, and who was guardian

of Martha Muse, her *non compos* kinswoman, lose her title by the statute of limitation, because Mrs. M. P. Muse, acting upon the advice of her attorneys considered the lands her ward's under the provisions of a will, which this court has recently declared void in *Smith* v. *Muse,* 134 Miss. 826.

To acquire title by adverse possession it must be adverse, exclusive and continuous. In this case, M. P. Muse who was guardian of Martha, the *non compos,* was advised that this land was "entailed" and descended under J. L. Muse's will at the death of her (M. P. Muse's) husband, B. F. Muse, to Martha Muse, her ward. Acting on this advice, M. P. Muse credited Martha Muse, her ward, with such rents, issues and profits as were received from the land in question, believing the land belonged to her ward, and dies under this impression. But the will of J. L. Muse was void, and was so held by this court in *J. P. Smith* v. *E. W. Muse,* 134 Miss. 827.

It is perfectly manifest that the possession and occupation of the lands here in dispute being in Mrs. M. P. Muse, widow of B. F. Muse, from the death of her husband up to her death, was not adverse to her own title. It is well-established law that where possession is concurrent, no title can be acquired by either party in the land on the grounds of adverse holding. Mrs. Muse was manifestly in possession. It is true she stated she did not claim the lands as against her ward, and acted on this by crediting her ward's estate with the rents, issues and profits.

Again it is equally true that had some other person been guardian of Martha Muse for ten or twenty years, and Mrs. M. P. Muse had, under the mistaken idea that the land belonged to the *non compos,* surrendered possession to such guardian, who held for his ward for the time necessary under the statute, the title would have ripened in the *non compos* by limitation. And it is likewise true that if another person had been guardian, and Mrs. Muse had refused to surrender possession, this

court would have decided the land belonged to M. P. Muse.

Where the owner and another are in possession the mixed or joint possession was referable to the title. See part of opinion of CAMPBELL, C. J., *Claughlin* v. *Claughlin*, 70 Miss. 387.; *Hamilton* v. *Moore*, (La.) 67 So. 523.

I respectfully submit that *Magee* v. *Keegan*, 35 Miss. 246, is not such a case as the instant case, and if this court thinks that case is good law in a like case, it ought not to apply here as the facts are different.

*Ray & Spivey*, for appellees.

The facts in this case are undisputed. The only issue presented is a question of law as to whether or not title inures to the benefit of the ward through a holding of a guardian claiming for the ward.

M. P. Muse not only claimed and held said land as the property of her ward, but, on two different occasions, in 1897 and 1913, in suits involving this land, filed her sworn pleadings in the chancery court of Madison county, Mississippi, wherein she solemnly and specifically denied having any sort of interest personally in said land, but avowed and declared that said land was in truth and in fact the property of her ward, Martha Muse.

The law of the case is fully covered in *Magee* v. *Keegan*, 35 Miss. 244. This is the only case in point which we have been able to find in this or any other jurisdiction. The soundness of the doctrine announced in the case of *Magee* v. *Keegan*, cannot be successfully attacked. As stated by counsel for appellant, in his brief, if any other person had been guardian of Martha Muse than M. P. Muse, then there could have been no question whatever, but that M. P. Muse would have lost all title to said land long ago, and said title would have become vested absolutely in Martha Muse. Can the right of this *non compos mentis*, Martha Muse, have been prejudiced merely because M. P. Muse happened to be her guardian?

M. P. Muse, should she have attempted to claim any title to said land, after the sworn pleadings filed by her

in 1897 and 1913 disavowing any interest therein, would have been estopped and the same estoppel would unquestionably apply to appellants, who claimed as heirs of M. P. Muse.

We, therefore, respectfully submit that the decree of the learned chancellor in the court below should be in no wise disturbed.

McGOWEN, J., delivered the opinion of the court.

This cause is submitted to us upon an agreed statement of facts, which statement is as follows:

"Come the parties to the above-styled cause by their attorneys of record, and agree: That the following agreed statement of facts and the judgment of the court rendered thereon shall constitute the transcript of the record in this cause, appealed from the chancery court of Madison county to the supreme court of Mississippi, and that the two documents shall be certified as such and be considered a full transcript in the supreme court of Mississippi for the consideration and final adjudication of this case, and which facts are as follows:

"James L. Muse died, testate, in 1857, leaving a will, which was, by this court, in the year 1924, in the case of *Smith et al.* v. *Muse et al.*, 134 Miss. 827, 98 So. 436, record No. 23432, held void under our statutes against perpetuities. In this case, the court held that each of the original seven devisees of James L. Muse, deceased, took their respective interests in his estate in fee simple.

"In 1872, the devisees of James L. Muse, deceased, partitioned his lands among themselves, when there was allotted to B. F. Muse that certain tract of land described as: twenty-four acres off south end of northeast quarter, southeast quarter and south half, southeast quarter, and eighteen acres off south end of Southeast quarter, southwest quarter, section 11, township 9, range 3 east.

"B. F. Muse died in 1897, without issue, and left as his sole and only heirs at law, his widow, Mrs. M. P. Muse. B. F. Muse was the last surviving devisee of James L.

Muse, except Martha Muse, who survived the said B. F. Muse, and died intestate in 1923, leaving the appellees as her sole and only heirs at law.

"Immediately after the death of B. F. Muse, his widow, Mrs. M. P. Muse, qualified as the legal guardian of Martha Muse, who had, at all times since infancy to the time of her death, been *non compos mentis.* The said Mrs. M. P. Muse was advised by counsel, and acted on this advice and believed, that the lands above described were the property of Martha Muse, and that she held them as such, and accounted to her said ward for the rents thereon during the entire time of her guardianship, and up to the time of the death of Mrs. M. P. Muse, in 1921.

"In 1896, appellees filed their exception to the appointment of Mrs. M. P. Muse as guardian of Martha Muse, alleging the conflict of interest with respect to the above-described land as one of the reasons why Mrs. M. P. Muse was not a suitable guardian for Martha Muse. Mrs. M. P. Muse filed her answer to said exceptions (see case reported *Muse* v. *Muse,* 76 Miss. 372, 24 So. 168), and specifically alleged that she held the above-described lands for her said ward, and that said lands were the property of her said ward.

"In 1913, appellees against filed suit against Mrs. M. P. Muse for an accounting on account of her guardianship of Martha Muse. Mrs. M. P. Muse filed her sworn answer in this suit, wherein she again alleged that she held the above-described lands as the property of her said ward, and accounted to said ward for the rents, issues, and profits therefrom.

"Mrs. M. P. Muse died, intestate, in 1921, and left as her heirs at law all of the appellants and all of the appellees in this cause.

"J. P. Smith and others filed their bill for partition of a large tract of land, which was in possession of the said Mrs. M. P. Muse at the time of her death, including the lands herein described. Appellees, as the sole and only heirs at law of Martha Muse, deceased, filed their

cross-bill, alleging title to the above-described lands in themselves, by descent and distribution, through the said Martha Muse, deceased.

"That the pleadings in this case raise only one issue, and that this appeal is taken for the sole purpose of determining this issue, which is as follows:

"Mrs. M. P. Muse, as guardian, held the aforesaid lands as the property of her said ward, Martha Muse, under the advice of counsel, and believed it was the property of Martha Muse, continuously and uninterruptedly, from 1897 to the time of her death in 1921. And the guardian and administrator of the estate of the said Martha Muse has held said lands since that time and still holds the same.

"The lower court held that title vested in Martha Muse by adverse possession through the holding aforesaid, and that Mrs. M. P. Muse, and any one claiming through her, is estopped to deny the title of Martha Muse and her heirs.

"From a decree to this effect, appellants prosecuted their appeal, and that is the sole issue presented."

It is clear from this record that by the decree of this court rendered in 1924, Mrs. M. P. Muse actually in law became seized and possessed of the lands involved in this controversy as widow of B. F. Muse upon his death, who died in 1897. It is equally clear that in 1897 she became the guardian of Martha Muse a *non compos mentis* from infancy until her death.

Mrs. M. P. Muse died intestate in 1921, and Martha Muse died intestate and *non compos* in 1923, leaving the appellees as the sole and only heirs at law of the said *non compos* and this controversy is between the heirs at law of Martha Muse, the *non compos,* and the heirs at law of the guardian of Martha Muse. The court below decreed the title of the lands in controversy to be vested in the appellees. It is equally clear that from the year 1897 to the year 1921, Mrs. M. P. Muse, as guardian of Martha Muse, accounted to the court for the rents and

profits of said lands in her guardianship of Martha
Muse, and held same out as the lands of Martha. In
1896 Mrs. M. P. Muse, in answer to a contest instituted
challenging her right to the guardianship of the *non com-
pos* filed her answer specifically alleging that she held the
lands for her said ward and that the lands were the
property of her said ward.

In 1913 the appellees filed a suit against Mrs. M. P.
Muse, guardian of Martha Muse, for an accounting as
to her guardianship. As guardian, she filed a sworn
answer wherein she again stated that she held the above
described lands as the property of her said ward (Mar-
tha Muse, the *non compos mentis*), and accounted to said
ward for the rents and profits of said land.

By the decision of this court in 1924, it appears that
the parties had been mistaken as. to the law governing
the construction of the will of the ancestor of B. F. Muse
and Martha Muse. It further appears that eminent coun-
sel advised Mrs. M. P. Muse that upon the death of her
husband, Martha Muse became the owner in fee of the
lands. Mrs. M. P. Muse, from the date of the death of her
husband in ———, until the date of her death, was in ex-
clusive possession of the lands.

The precise question presented for decision by this
court is: Did the exclusive possession of Mrs. M. P.
Muse, as above stated, vest title in her ward, Martha
Muse, or was her holding of said lands exclusively and
adversely for her own benefit; the title to the lands un-
questionably having vested, on the death of her husband.
in her and not in the ward? Pomeroy's Equity Juris-
prudence (4th Ed.) vol. 2, section 842, as to "A Mistake
of Law," is as follows:

"*The General Rule, and Its Limitations.*—The doctrine
is settled that, in general, a mistake of law, pure and
simple, is not adequate ground for relief. Where a party
with knowledge of all the material facts, and without
any other special circumstances giving rise to an equity
in his behalf, enters into a transaction affecting his in-

terests, rights, and liabilities, under an ignorance or error with respect to the rules of law controlling the case, courts will not, in general, relieve him from the consequences of his mistake. The reasons are obvious. The administration of justice, the law itself as a practical system for the regulation of human conduct, requires that some fundamental assumptions should be made as postulates. The most important, perhaps, of all these, is the assumption that all persons of sound and mature mind are presumed to know the law. If ignorance of the law were generally allowed to be pleaded, there could be no security in legal rights, no certainty in judicial investigations, so finality in litigations. While this general doctrine prevails in equity as well as at law, its operation is not there universal; it is subject to modifications and limitations; equity does sometimes exercise its jurisdiction on the occasion of mistakes of law. If the mistake of law is not pure and simple, but is induced or accompanied by other special facts giving rise to an independent equity on behalf of the mistaken person, such as inequitable conduct of the other party, there can be no doubt that a court of equity will interpose its aid. Even when the mistake of law is pure and simple, equity may interfere. Many judges have attempted to formulate a criterion for all instances of pure mistakes of law which will be relieved in equity, but their conclusions are conflicting, and none is sustained by the authority of judicial decisions. It has been said by judges of the highest ability that the general doctrine heretofore stated, and embodied in the maxim '*Ignorantia juris non excusat,*' is confined to mistakes of the general rules of law—the first class of mistakes described in the preceding paragraph; that it has no application to the mistakes of persons as to their own private legal rights and interests—the second class before described; that '*jus,*' in the maxim, denotes the general law, the law of the country, and never means private legal rights.''

It will be seen from the above quotation that equity does not relieve where a party mistakes the law as to his private legal rights.

Mr. Justice WHITFIELD, in *Railroad Co. v. Jones,* 73 Miss. 110, 19 So. 105, quoting from the above section and section 849, Pomeroy's Equity Jurisprudence, concludes with this statement: "We have most carefully examined the authorities on this distinction, and, without burden-ing this opinion with quotations, feel no hesitancy in say-ing it is clearly shown and most abundantly established by the highest authority."

Lord Ellenborough said: "Every man must be taken to be cognizant of the law; otherwise there is no saying to what extent the ignorance might not be carried. It would be urged in almost every case."

This view is supported by Lord Westbury in *Cooper v. Phibbs,* L. R. 2 H. L. 149, 170, wherein he said: "In such a state of things there can be no doubt of the rule of a court of equity with regard to the dealing with that agreement. It is said *ignoranti juris non excusat;* but in that maxim the word *'jus'* is used in the sense of de-noting general law—the ordinary law of the country. But when the word *'jus'* is used in the sense of denoting a private right, that maxim has no application."

Also see Pomeroy's Equity Jurisprudence, vol. 2, sec-tion 843.

The effect of mistake of law is discussed by our own court in the case of *Lyon v. Sanders,* 23 Miss. 530. Mr. Justice FISHER said:

"And this brings us to the consideration of the only point in the case, whether a mistake as to law, or the legal effect of the notes executed in discharge of the old note, can avail the complainants. If this mistake had been produced by the makers of the notes, undertaking to enlighten the complainants as to the law bearing on the transaction, and opinions thus advanced by the de-fendants had been acted on by the complainants, they might be entitled to relief. But such is not the fact in

this case.  The complainants, with the aid of their attorney, undertook to decide the law for themselves, and to apply its principles to the proposition submitted and the contract consummated thereupon.  They say that they were mistaken in their application of the legal principles to the facts.  Can they be relieved against such a mistake?  In the case of *Lyon* v. *Richmond,* 2 Johns. Ch. R. (N. Y.) 60, Chancellor KENT, says, 'The courts do not undertake to relieve parties from their acts and deeds fairly done on a full knowledge of facts, though under a mistake of the law.  Every man is to be charged at his peril with a knowledge of the law.  There is no other principle which is safe and practicable in the common intercourse of mankind.'  Again, in the case of *Hunt* v. *Rousmanier,* 1 Peters, 15, 7 L. Ed. 27, the court said, 'That mere mistakes of law are not remediable is well established,' and that whatever exceptions there may be to the 'rule, they will be found few in number and to have something peculiar in their character, and to involve other elements of decision.'  We deem it unnecessary to multiply authorities on this point.''

But our own court has considered the question of a mistake of law on the part of guardian and the application of the statute of limitations thereto.

In the case of *Magee* v. *James E. Keegan et al.,* 35 Miss. 244, 72 Am. Dec. 123, where the guardian who actually owned certain slaves, but accounted to the court for the slaves as belonging to his ward, discovered afterwards that he was mistaken, that he actually owned one slave absolutely and had a life estate in the others, in passing on these facts, Mr. Justice FISHER said:

''This case may be made to turn on a single point.  The complainant, having qualified in 1848, as guardian of his infant daughter, returned an inventory of the property, now claimed by him, as the property of his ward. It appears from the bill that he so continued to recognize the title of his ward, until about the year 1856, when he discovered that he had a life estate in the slaves, for

which he now sues. He was fully informed as to the facts, and could have known his title if he had called on counsel to apply the law to the facts as they existed, instead of trusting to his own judgment; and having treated the slaves for a period of about eight years as the property of his ward, he must be regarded as having surrendered whatever claim he could at one time have asserted.

"The statute of limitations vests in the ward a good title as against the guardian. Decree affirmed."

In the instant case the guardian and the ward are now both dead, and the controversy here is between the heirs of the ward and the heirs of the guardian. From 1896 to 1921 this guardian held this property openly, notoriously, and adversely for her ward and against her own legal rights, accounted for the rents and profits, and, in the pleadings filed in the court, disclaimed, when charged with holding adverse interest, that she did so hold any adverse interest, but that the property here in controversy was the property of the ward.

Unfortunate as it may seem that a guardian should lose property to which he has good title, by a mistake of the law, yet, on the other hand, it must be considered that wards like those under disability, whether by minority or by mental incapacity, must depend solely and alone upon their guardians to assert title for them to their property, and we must assume that Mrs. Muse, in order to retain the guardianship of her ward, chose to forego her right to the property. At any rate this court cannot now correct a mistake which she made in 1896, and perpetuated throughout her lifetime as to her legal rights. Being mistaken as to the law and as to her private rights, she asserted title for her ward in this property, and the statute of limitations has effectually vested title to these lands in the *non compos mentis,* Martha Muse, and, upon her death, in her heirs at law.

The judgment of the court below is affirmed.

*Affirmed.*