## CHLORA HOY v. LEROY HOY.

### [48 South. 903.]

1. DEEDS. *Mistake as ground for avoiding. Interest in land.*

    A mutual mistake as to the interest of the grantor in lands, arising from the advice of counsel, is ground for avoiding a deed conveying a greater estate than the parties believed the grantor owned.

2. WILLS. *Revocation. Code 1892, §§ 4489, 4490. Implied revocations*

    Code 1892, §§ 4489, 4490, relating to the revocation of wills, apply only to direct and express revocations, and do not abolish the doctrine of implied revocation.

3. SAME. *Marriage.*

    A will is not revoked alone by the subsequent marriage of the testator, although the statute makes his widow an heir of the testator.

FROM the chancery court of Yazoo county.

HON. G. GARLAND LYELL, Chancellor.

Chlora Hoy, appellant, was complainant in the court below; Leroy Hoy, appellee, was defendant there. From a decree in defendant's favor the complainant appealed to the supreme court. The facts are fully stated in the opinion of the court.

*E. L. Brown,* for appellant.

Implied revocations are still permissible under our statute, which is a reproduction of the English statute, and is the same as it has been since 1821, Hutchinson's Code, 649; *Garrett v. Dabney,* 27 Miss. 335; *Jones v. Moseley,* 40 Miss. 261. There is no change in our statutes with reference to the making and revocation, operation and effect of wills since these cases, except as to the power of women to make them, and the rights of husband and wife under the wills of each other.

There is scarcely any diversity of opinion upon the question of whether or not a statute like ours permits implied revocations.

At common law, the revocation of a man's ante-nuptial will was implied from his marriage and the birth of issue, provided, it disposed of substantially all his property and was not made in contemplation of marriage. If made in contemplation of marriage, the implication did not arise from the occurrence of the two, because that fact showed that he then intended that it should remain his will, notwithstanding these new relations, obligations and duties. If not made in contemplation of marriage, still it is not revoked upon marriage alone, because, in the last analysis, the wife could not inherit any part of the husband's property, the object of the new relations, obligations and duties would not be benefited by the revocation, which would, therefore, be fruitless. The course of descent, until the birth of issue, remained the same as when the will was executed, and there is no room for the implication that the objects of his affection, which would be benefited by the revocation, were his then heirs rather than his legatees. Concretely, the widow got no more and no less by the revocation. If not made in contemplation of marriage, but disposed of practically the entire estate, the revocation was implied from the birth of issue, not because, otherwise, the issue would be unprovided for, but because the law presumes that it was not his intention that his child should be unprovided for. Some of the judges rested the

implication upon the idea that at the time the will was executed, it was a "tacit condition annexed to the will that the testator did not then intend that it should take effect, if there should be a total change in the situation of his family, such as is wrought by the subsequent marriage and the birth of issue" while others placed it upon the ground of a "presumed alteration of the testator's intention, arising from, and occasioned by new moral duties, obligations and relations." Chancellor Kent, *Brush v. Wilkins,* 4 Johns. Ch. 506, the leading case in this country.

We do not see any practical deduction to be made from a consideration of the two theories, upon which the rule was based, the one adopted by Lords Kenyon and Ellenborough or the one adopted by Lord Mansfield, and as Chancellor Kent thinks, the civilians. Each rests upon the intention of the testator, the essence and soul of every will. The difference is one of time, and not of reason for the rule, nor one of consequences to survivors. *Brush v. Wilkins, supra.*

Just here, it is important that the court should not, as do some of the courts and as did the chancellor and the counsel for appellee in the court below, confound two different propositions. The implied revocation did not take place because, but for the revocation, the child would have been unprovided for, but because it was presumed that the testator did not intend such condition. The difference is that the law presumes that he did not intend, rather than that he did intend that his child should be left unprovided for, and the implication arises upon the presumed intention that the instrument should not be his will at the time of his death. The difference between the implied revocation in the case of issue and no revocation in case of marriage alone is the difference between a fruitful and a fruitless implication of the law, besides the fact that, by the execution of a will, the testator evinced his intention as between his then heirs and his legatees, and his affection for subsequently born brothers, nephews, nieces, and so on, was not supposed to be sufficiently potent to have moved him in the first instance or

·subsequently altered his opinion, as evinced by his will. *Brush* *v.. Wilkins, supra.*

Chancellor Kent, by way of tracing the proposition to its source and stating its qualifications, gives quite all of the learning on the subject, and his opinion is the leading case in this ·country, but we desire to call especial attention to his statement ·of what was held in *Sheath v. York* by Sir William Grant, which is also frequently referred to and approved by other ·courts in this country, as a correct qualification of the general rule. That case holds the proposition that, where a widower, with a son and a daughter, devises his real and personal estate, marries again and has a second daughter, his will is revoked as to the personality, but not as to the realty, because the revo· cation would let in .the subsequent child, as to the personalty, but not as to the realty. In other words, in so far as the revo- ·cation might be fruitful, not fruitless, it is held to have taken place, if there was ground for the implication, based either upon Lord Kenyon's or Lord Mansfield's theory.

Kent also shows that Lord Ellenborough, in *Kenebel v. Scrofton,* implied in his opinion there that in order that the revocation take place the will must have disposed of the entire ·estate, and to the "exclusion and prejudice" of those unpro- vided for, one of whom could not be the wife, because she was not prejudiced by the will, or benefited by the revocation. ·As- ·to her, the revocation would be fruitless, as in the case of *Sheath v. York,* the revocation as to the land would be fruitless to the daughter, the son being entitled thereto, even after a revoca- ·tion.

Chancellor Kent, in speaking of the case of *Johnson v. John- son,* decided by Sir John Nicholl in 1817, shows the bent of mind to be in favor of holding that marriage alone would work a revocation, if thereby the wife would be let in, but was de- terred from so announcing upon the principle that the cer- tainty of the law would be maintained by holding to the settled

rules of common law, all of which of course was *dictum* because then the wife did not inherit under the law of New York.

Upon a moment's reflection we know that the common law rule was not based upon the law of primogeniture. Had it. been, the rule would never have been any part of the law of any state in this country, because the law of primogeniture never was in force here; the maxim *cessante ratione legis, cessat et ipsa lex* would have forbidden the rule here. A moment's. reflection shows that it was not that dower was considered "sufficient provision" for the widow which formed any basis of the rule, but that dower was all she would get, sufficient or insufficient, revocation or no revocation, and that she got at all. events. The rule was not based upon sufficiency or insufficiency of dower, in so far as marriage, under it, would not work a revocation, but upon the utter folly and futility of a revocation, which gave the object of the implication no more and no. less. The revocation would have been bootless and silly, but not so under our law, now that the wife can inherit, just as a child could at common law. Besides, if the English did think dower sufficient, and that was the reason of the rule, our law deems it insufficient, for she may inherit all her husband's estate. Is the provision of the law that she may not be entirely disinherited any more a provision for her than that she may take all?

Nor was the implication dependent upon the birth of a son,. or some of the cases stated, as shown by *Sheath v. York, supra,* nor upon any absolute right of an heir, for the eldest son could be disinherited. Some of the cases we will cite in support of our contention, remark the contrary of these principles, but the ground of decision in each case is that by marriage, the wife becomes heir of her husband, or he heir of her.

By way of laying foundation for the citation of some authorities involving the revocation of ante-nuptial wills of women, and before coming to the proposition directly decisive of

this case, we may state that at common law the ante-nuptial
will of a woman, not disposing of her separate estate with
reference to which she was empowered to make a will by the
instrument creating it, was revoked by implication upon her
marriage, because, by the marriage contract, her husband was
invested with the ownership of her personal property, and the
income from her realty, as also the estate by curtesy in the event
of issue (*Garrett v. Dabney,* 27 Miss. 335), and for the fur-
ther reason, and the one most generally assigned, that the mar-
riage took away the testamentary capacity of the woman and
thereby destroyed the ambulatory nature of a will, which was
its essence, and without which, the instrument could not be a
will, (*Swann v. Hammond,* 138 Mass. 45), she being powerless,
under coverture, to make another, alter or revoke that one.

At common law, the interest of the wife in the estate of her
deceased husband was that of dower in her paraphernalia, both
of which she took in virtue of the marriage contract, and not by
inheritance. She could inherit nothing from him. She took
thus much under the marriage contract, and could not be de-
prived thereof by the will of the husband because she did take
by contract. 2 Blackstone, chap. 29, "Title by Marriage."

Under our laws, the wife is heir of the husband just as fully
as the eldest male was heir of his father at common law. Her
interest in the estate of her deceased husband is in no sense that
of dower. She is his heir. She may inherit all of his estate, if
he have children, she inherits equally with them, and he cannot
by will deprive her of her legal share, unless she have an estate
equal to her legal share.

She is the favored heir of our law because children may be,
while she may not be disinherited, unless she may have an es-
tate equal to her legal share of his estate. In the event of no
will, she takes by descent and not by purchase, and she has no
interest in his estate while he lives. She has no interest at any
time akin to dower. *Jones v. Somerville,* 78 Miss. 272, 28
South. 940. She is an heir favored by the law as was the eldest

male, but she is more favored than the eldest male, or any other heir, even the husband of her, because she in addition to her legal share in fee, inherits the use of all exempt property during her widowhood. By our law, she is even further favored. She has been fully and completely emancipated from all her common law disabilities, and has ceased to be a mere link in the chain of the husband's title, and the bearer of children to perpetuate his line of descent. Under our law and under our institutions and society, she is regarded as engaging, and in fact does engage, more intensely her husband's emotions of interest and affection than under laws, institutions, and society, where considerations of state and property enter largely into the selection of wives as at the time the rule under consideration was established.

Now counsel for appellee say and the chancellor held that because of this extreme solicitude of our law for the widow, marriage of a man does not revoke his ante-nuptial will, and the common-law rule remians the law of this state. We say that because of this same solicitude of our law for the widow, so much of the common-law rule as required that there should be issue born is not now the law of this state, and that marriage alone revoked such will.

The reason of the common-law rule was that inasmuch as the implied revocation would be fruitless upon marriage alone, that did not revoke, but that inasmuch as the revocation on the birth of a child would be fruitful, the birth of a child did revoke. Inasmuch as the wife at common law could not inherit from her husband, her marriage did not revoke; but, inasmuch as the child at common law could inherit from its father, its birth did revoke. The reason of the law is its soul and essence, and *cessante ratione legis, cessat et ipsa lex.* Upon this maxim, we plant our contention for a reversal.

In *Tyler v. Tyler,* 19 Ill. 151, it is held that the reason of the common law rule was that the wife did not inherit from her husband, but the child did, and that inasmuch as the wife,

under the laws of that state, did inherit it from her husband, in the event there were no children, and there were none in that case, the rule of the common law requiring the birth of issue was so far abrogated as that the marriage alone revoked the ante-nuptial will of the husband.

In *Mission Board v. Nelson,* 72 Ill. 564, the Illinois court reaffirmed that case on the doctrine of *stare decisis,* but added, "we do not wish to be understood as intimating that that case cannot be maintained by reason and authority," contrary to what is said of this case in the Minnesota case relied upon by counsel for appellee.

In *In re Tuller Estate,* 79 Ill. 99, the Illinois court again reaffirmed the two previously referred to, but took the proper distinction that inasmuch as the widow had, three children, at the time of her second marriage, who would take her estate but for the will and to whom it was devised by the will, and the husband would take nothing upon a revocation, the implied revocation did not take place, citing *Sheath v. York, supra.*

*Duryea v. Duryea,* 85 Ill. 50, reaffirmed the *Tyler* and *Nelson cases,* holding that inasmuch as at the time of the execution and at the time of his death, the testator had no children and the wife could inherit his estate, his ante-nuptial will was revoked by marriage alone.

In *Swann v. Hammond,* 138 Mass. 45, that court said that, if it were unrestrained by the statute, as previously herein indicated, it would hold that marriage alone revoked the ante-nuptial will of a man or a woman, rather than that marriage and issue were necessary to revoke such will of a woman.

In *re Teopfer's Estate* (N. M.), 78 Pac. 53, under statutes making husband and wife heir one of the other, and provisions by statute otherwise similar to ours, it is held that the ante-nuptial will of a woman is revoked upon a marriage without subsequent birth of issue. "The mere fact of marriage did not revoke the will, but it was the coming of a new heir, for by our

law, not only does a man or woman by marriage get a husband or a wife, but an heir also."

*McWillie & Thompson,* for appellee.

The law of this state touching the making and the revocation of wills is believed to be purely statutory. While the practice of making wills, as shown inferentially by instances named in the Bible, existed among the Hebrews in the days of the patriarchs and the right of testamentary dispositions was introduced into Athens by the Laws of Solon, yet before the statute of wills in England (32 and 34 Henry, 8, A. D. 1534, 1536), testamentary dispositions of real property were unknown and unauthorized and such dispositions of personal property were limited to cases where the testator left neither wife nor children surviving him. 1 Redfield on Wills, 3; 1 Jarman on Wills, 32.

By the ordinance organizing the Mississippi Territory, not to mention the constitution of 1817, schedule section 5, all English statutes were excluded from operation in this state. None was in force in 1849, after the constitution of 1817 had been superceded by that of 1832, and of course none is now in force. The ordinance organizing the territory is yet operative, not having been repealed in whole or in part by congress or the state legislature. *Boarman v. Catlett,* 13 Smed. & M. 149; *Sessions v. Reynolds,* 7 Smed. & M. 130. The legislature of Mississippi, at least as early as 1807, passed an elaborate statute covering the subject of last wills and testaments, Statutes of Mississippi Territory, 1807, p. 275, and this and subsequent statutes we think became the exclusive law on the subject in this state.

The case of *Garrett v. Dabney,* 27 Miss. 335-342, cited by appellant's counsel, is by no means an authority against appellee's contentions. That case involved a married woman's will written when she was unmarried but at a time when married

women did not under the law have full disposition of their property, and the case held that the subsequent marriage of the testatrix destroyed the ambulatory nature of the will and left it no longer subject to the wife's control. The result was correct under the statutes then in force since the will was that of a married woman and its validity in so far as concerned the question whether the testatrix belonged to a class of persons authorized by law to make wills was to be determined as of the date of her death and not as of that of the date on which the pretended testament was written. At the time of her death no statute authorized a married woman to make a will. Hutchinson's Code, sec. 14. Married women were first empowered to make wills by Code 1871, § 1785, in so far as we have been able to find a statute authorizing them to do so. The reference in the opinion in the case last mentioned to the common-law rule, if there can be said to have been a common-law rule on the subject, was wholly unnecessary and amounts to nothing more than a statement to the effect that even if such rule were applicable it would not affect the conclusion there reached. The case is in truth, when correctly understood and applied, an authority in appellee's favor; because it shows that under the laws of England, although based on statutes in many particulars like ours, the will of a single woman is not revoked by her subsequent marriage, where, as was the case here since 1880 but not before, the law gives her full power of disposition over it. See, 27 Miss. 343. The case, however, does adjudge that the statute, now Code 1906, § 5079, does not forbid implied revocations, a proposition the correctness of which we are by no means prepared to admit as true under our present statutes and we question its correctness under the statutes in force when the decision was made. In this state, since 1880, there is no difference touching implied revocations between the wills of married men and married women, and by the laws of England, the death of the wife after the writing of the husband's will and his subse-

quent marriage did not revoke the will by implication or otherwise. 1 Redfield on Wills, 299.

The testator in the case at bar was a man, Louis Hoy, and we are told that under the laws of England "the marriage of a man * * * had no revoking effect upon his previous testamentary disposition, in regard to either real or personal estate on the ground, probably, that the law had made for the wife a provision independently of the act of the husband by means of dower; nor did the birth of a child alone revoke a will made after marriage since a married testator must be supposed to contemplate such an event, etc." 1 Jarman on Wills, 123. See, also, 1 Redfield on Wills, p. 292. Of course, the death of the testator's first wife, Ellen, did not revoke the will, the bequest to her simply lapsed on her death and went to the next taker.

The statutes of Mississippi now in force and which have been in force only since 1880, although a nearly similar statute is to be found in Code 1871, § 1281, are Code 1906, §§ 5086, 5087, providing, in case the husband's will make unsatisfactory provision for the wife or fail to make any provision for her, that she may renounce the will and, there being no children as in the case at bar, take one-half the estate.

Where, as in this case, no provision was made in the will for the widow the statute itself defines her rights and places limitations on them. She is to renounce and take half, not the whole estate. The law would be inconsistent if it allowed the same state of facts to revoke a will by implication and give the widow the whole and at the same time grant her the right to renounce the will and take one-half of the estate. If there ever was a time in the history of our law when the death of a first wife and a marriage to a second one effected a revocation of a previously written will of the husband, *that law was changed by the adoption of the code sections above cited.* Code 1906, §§ 5086, 5087, and their prototypes.

And for the same reason the cases cited by counsel for ap-

pellant from the supreme courts of Idaho, Florida, Michigan, and elsewhere are believed to be inapplicable to the case at bar.

One thing seems certain, an implied revocation and an express authority for renouncing the same will do not coexist. If the legislature has provided a procedure by which a dissatisfied widow may renounce her deceased husband's will and expressly provided what part of his estate she shall take upon renunciation, the statute is the exclusive measure of her right and no implied revocations will be indulged in her favor.

Counsel for appellant puts too much stress upon the fact that the widow is by statute made the heir of her deceased husband. The statutes do not denominate her as an heir, but simply provide what share of his estate she shall take *and this they give in lieu of dower, etc.* If the giving of dower prevented a marriage from effecting the revocation of a husband's will, why will not the giving of a greater estate *in lieu of dower* do the same thing? The relationship between husband and wife is not changed by the statutes but remains the same as before the recent statutes were enacted. Their obligations and duties were neither restricted nor enlarged by the statutory change. The subject of revocation of wills was not in legislative contemplation when the present statutes of descent and distribution were enacted; but the displacement of wills, revoking and renouncing them, was the very subject matter in mind when the code sections above cited were enacted.

Referring to the case of *Tyler v. Tyler,* 19 Ill. 151, cited by opposing counsel (much modified by subsequent decisions in that state, *In re Tuller,* 79 Ill. 99, S. C. 22 Am. Rep. 167), we dare say there was when that case was decided no statute of Illinois authorizing a widow to renounce the will of her deceased husband and providing in that case what share of his estate should go to her. If a new statute provide that the widow shall be heir to her deceased husband in case he die intestate and also provide, in the same or a different enactment since all statutes must be read together, that in case the husband die leaving a

will making no provision or an unsatisfactory provision for her that she may renounce the will and take a child's part, or there being no children, one-half of the estate, the whole of the statute on the subject must be given operation. Implication from a part of a new statutory scheme cannot supply a remedy for a supposed hardship seemingly arising therefrom where the legislature has expressly provided a remedy for that very case.

The observations made touching the Illinois case, *Tyler v. Tyler, supra,* apply to *Teopfer's Estate,* (New Mex.) 78 Pac. 53, cited by counsel. We dare say no statute of New Mexico authorized the widow to renounce the will of her deceased husband, or, if one existed, it was not brought to the attention of the court, and the same statement may be applied to nearly all the other cases cited by appellant.

When our legislature enacted Code 1906, §§ 5086, 5087, and the originals of which the code sections are prototypes it provided expressly for such cases as this. We feel sure all the authorities cited by opposing counsel, unless it be the Colorado case, to which we give attention further on, fall short of being in exact point, because the statutes of the several states are not the same as ours; but if they be found to be exactly the same we could not surrender a conviction that the cases were wrongfully decided and do violence to legislative intent; the cases cited by our associate counsel are the more worthy to be followed. Especially do we recommend to the court the case of *Carey v. Hulett,* 66 Minn. 327, 338; 69 N. W. 31, 34 L. R. A. 384.

The only English, or as appellant's counsel call it, common-law rule on the subject of the implied revocation of wills is the one predicated of a subsequent marriage and birth of issue. Counsel fail to note that the rule to which they refer is an express statutory rule in this state and that the subsequent marriage of one who has written a will and the birth of issue do not revoke the will by implication; it is affected by express statutory provision to a limited extent only. Code 1892, § 4489;

·Code 1906, § 5079. The implied revocation in such case is gone from our law and we have in place of it an express statutory rule which displaces the will not absolutely but to the extent only as therein specified. We do not recall any other state ·of facts which, under the English rule, revoked a will by implication; we believe all of them will be found to be provided for by our statutes, if others existed, and we again insist that our law of wills is exclusively statutory. Had issue been born to the testator in this case the will would not have been revoked; it would under the statute Code 1892, § 4489, have been vacated only as provided in the section.

Can it be that marriage of the testator alone after the writing ·of a will is more effective in displacing the will than would be the birth of issue? Under the English rule marriage alone had no effect, the birth of issue alone wrought the revocation. Now, .after implied revocations are gone from our law and we have rigid statutory rules on the subject, counsel ask this court not only to depart from the statutes and revive the rule but to reverse the rule when revised for the benefit of their client. This, we submit, should not be done.

*The authorities:* In *Hoitt v. Hoitt,* 63 N. H. 475, 56 Am. Rep. 530, the supreme court of New Hampshire said that ·"where the legislature had established certain modes by which ·a will may be revoked, it is not within the legitimate power of the courts to dispense with such requirements, etc.," and this statement was made, although the New Hampshire statute contained a proviso, not to be found in ours, perpetuating implied revocations, and the case collects the authorities showing that the death of a first wife and the marriage to a second one did not revoke the will.

The case, *Will of Ward,* 70 Wis. 251, 5 Am. St. Rep. 174, 176, shows that the Massachusetts statute on the subject of revoking wills itself in terms recognized implied revocations and that the Wisconsin statute did the same thing; and we doubt not but that such recognition is to be found in the statutes of

the states whose supreme court opinions are cited on the point. by opposing counsel. The Mississippi statute makes no such recognition, but manifestly, we think, was intended to be exclusive.

The Connecticut statute, 1821, touching the revocation of wills like our own, did not recognize implied revocations and the supreme court of that state would not engraft an exception on to it. *Goodsell's Appeal,* 55 Conn. 171, 10 Atl. Rep. 557.

The Colorado case, *Brown v. Scherrer,* 5 Cal. App. 255, 38 Pac. Rep. 427, comes nearer to the point than any other case cited by counsel for appellant, but that case, as we see it, presents this singular absurdity. The opinion of the court tells us that under the statutes of the state, embodying the civil law conceptions of community property and forced heirs, neither a husband or a wife could devise more than one-half of his or her estate and the other half went to the survivor, and that a will of more than one-half was inoperative to deprive either a husband or wife of their right to one-half under the statute. This seems by necessary implication to empower a disposition of the other half of the property by will. The statute was certainly designed not only as a shield to protect its beneficiary but it measured as well the rights of persons claiming its benefits. Instead of enforcing this statute and giving the aggrieved party one-half of the descendant's estate, the court wandered into the misty realms of "implied revocations" and adjudged that the will had been revoked by implication when under the statute it was simply inoperative as to one-half the estate.

Counsel for appellant in reply to that part of our brief in which we contend that a widow's right to renounce a will and take half of the deceased husband's property could not co-exist with an implied revocation giving her the whole of it, insists that there is no incongruity between the two; that an implied revocation is applicable where there is no will at all or at least results in no will at all, and a renunciation is predicated of the existence of a will to be renounced. This argument is what

logicians call begging the question; it assumes the point in controversy and claims that the assumption establishes it. There can no more be an implied revocation than a renunciation of a will without its previous existence. The implied revocation of a will is no more operative until after the death of the testator than is the renunciation; before death the testamentary instrument is wholly subject to the discretion of the maker, there is no implication or presumption on the subject.

Both revocation and renunciation are predicated of a preexisting will, both came into play after the death of the testator and not before; both are designed to do away, in whole or in part, with wills. The legislature having provided expressly for the very case now under discussion its provisions should be given effect.

*Campbell & Campbell,* on the same side.

It is urged that since, at common law, marriage and birth of issue revoked an ante-nuptial will making *entire disposition* of a testator's estate, without provision for prospective wife or issue, therefore, under the laws of this state, by which the wife and the husband are made heir one to the other, marriage alone impliedly revokes such a will.

This contention is unsound and fallacious; our opponent will have to work out his problem by the whole rule and not the half of it.

Under our statutes, a man cannot disinherit his wife, whether his will was made before or after marriage, and the maxim, so extensively quoted by appellant, to-wit: *Cessante ratione legis cessat et ipsa lex,* applies in full force in behalf of appellee. Because the reason of the common law rule was that the intention would not be imputed to the testator of entirely disinheriting his issue, and the rule was never applied, unless there had been a total disposition of the testator's property to the prejudice of testator's issue, and if the slighest provision was made in the will for the issue, or if any portion of the testator's prop-

erty was left out of the will, however small, the rule did not apply and the ante-nuptial will was not revoked by marriage and birth of issue. This is the reason of the rule given in the leading American case of *Bush v. Wilkins*, 4 John Chancery (N. Y.), 506, in which the law on the subject is reviewed by Chancellor Kent, and he states that the reason of the rule to be, "that it was not the intention of the testator that his child should be unprovided for." See, 7 Underhill on Wills, 325, et, seq.

Our law under all conditions having amply provided for the wife, the reason of the rule no longer exists, and the rule itself has become obsolete. *Hoitt v. Hoitt*, 63 N. H. 475, 56 Am. Rep. 530.

Under our statutes no man can disinherit a child born after the will is made, nor any subsequent wife, and certainly the maxim, *cessat ratio, cessat lex,* applies in all its force.

Opposing counsel assumes a fallacious premise, to-wit: that the reason that, at common law, an ante-nuptial will of a single man was not revoked by subsequent marriage, was that a revocation would be fruitless, as the wife could not inherit, and that upon the birth of issue, an heir came into being, who could inherit and the revocation of the will became fruitful, and it was revoked. This is not the reason assigned by Chancellor Kent in *Bush v. Wilkins, supra,* but the reason stated by this illustrious jurist was that, the widow would get dower and also could inherit only the personal property. 7 Underhill on Wills, Sec. 239, p. 325, et seq.

Again if by birth of issue the revocation became fruitful was the reason of the rule, then the birth of issue alone should revoke a will made while a man had no issue, but unquestionably this was not the case.

In the case of *Morgan v. Ireland,* 1 Idaho 786, cited by counsel, the court bases its reason for revocation of the will on the distinct ground that, by the laws of Idaho, the wife would be unprovided for, unless the will was revoked, and that the rule at common law, that marriage of a man alone did not revoke the

will, was for the reason that the wife was amply provided for by her dower rights.

The other case chiefly relied on in the brief of attorney for appellant is the case of *Brown v. Scherrer,* (Col.) 38 Pac. Rep. 427. We do not think this case either sound on authority or reason. In order to revoke the will the court invoked the rule of the common law, that marriage and the birth of issue revoked the ante-nuptial will of a man; but the rule did not fit the facts because there was no issue, and under the rule there could be no revocation. In order to make the rule fit the facts, by specious but unsound reasoning, the court likened the wife to the English eldest son and says that she occupies the same position as the eldest son did under the English rule of *primogeniture,* and, consequently, on the idea of forced heirship the Colorado court cites *Garrett v. Dabney,* 27 Miss. 335, which, properly understood, is authority for appellee.

The court will thus see that the Colorado court bases its opinion on the fact that the wife was a forced heir, which counsel for appellant admits is error, and which Chancellor Kent and the best considered American authorities hold, is not the reason upon which the common-law rule that marriage and birth of issue revoked a will, is based.

Code 1906, § 5087, Code 1892, § 4497, provides that if any husband or wife shall not make any provisions for the other, the survivor shall share in the estate of the deceased husband or wife, just as if there was an unsatisfactory provision made in the will, and no renunciation shall be necessary. This statute applies to a will of a husband or wife whether made before or after coverture, and by operation of law, when there are no children, the husband or wife gets one-half of the estate. Under the statutes of Colorado the husband or wife has no right to renounce any will unless it was made while married. Gen. Statute of Colorado, chapter 72, sections 2269 and 2270.

In other words the right of a husband or wife, under the

Colorado statutes, gets one-half of the estate applied only to wills made during coverture.

The case of *Carey v. Hulett,* 66 Minn. 327, 69 N. W. 31, 34 L. R. A. 384, 61 Am. St. Rep. 419, is directly in point, it discusses the entire question at issue, and criticises the case of *Tyler v. Tyler,* 19 Ill., and *Brown v. Scherrer,* 5 Col. 255, 38 Pac. 427, so strenuously relied on ·by attorney for appellant; and we think clearly and forcibly demonstrates the unsoundness of the position taken in these cases.

To the same effect are: *In re Lyon's Will,* (Wis.) 74 N. W. 363, 65 Am. St. Rep. 52; *Goodsell's Appeal,* 55 Con. —, 10 Atl. 557; *Roan v. Hollingshead,* (Md) 17 L. R. A. 592; *Noyes v. Southworth,* 20 N. W. 891; *In re Hunt's Will,* (Me.) 17 Atl. 68; *Fellows v. Allen,* (N. H.) 49 Am. Rep. 328; *Morgan v. Davenport,* 60 Tex. 230.

Under the statutes of our state, as they now exist, even marriage and birth of issue would not revoke a will, because our statutes furnish the remedy for the evil which the application of the common-law rule was intended to prevent. In support of this view the court will find abundant authority in the cases cited, *supra,* but we especially call the court's attention to the case of *Morgan v. Davenport,* 60 Texas 230.

At the time *Garnett v. Dabney,* 27 Miss., was decided a woman did not own property after coverture, but the husband has vested rights therein. This was the reason of the ·decision ·of that case. The law in this respect has been entirely changed.

FLETCHER, J., delivered the opinion of the court.

One Louis Hoy, on the 23d day of April, 1898, made a will in which he divided his property equally between appellee, Leroy Hoy, his nephew, and his then wife, Ellen Hoy. Some time thereafter Ellen Hoy died, and in 1900 Louis Hoy married the appellant, Chlora Hoy, and died without making any express revocation of his will. He left no children or descendants of

children. Some time after the death of Louis Hoy, the surviving wife and the nephew, Leroy Hoy, were advised by counsel that the widow had the right to renounce the will and thereby se--cure one-half of the estate; and upon this understanding of the measure of her rights she executed a conveyance of all her prop-erty to appellee, reserving a life estate in the home place upon the further agreement by appellee that the widow should be paid an annuity of $75. This agreement was entered into in the utmost good faith by both parties to the contract, and seems to have been faithfully carried out by Leroy Hoy. Appellant, however, having been advised that the will of her husband was by operation of law revoked by the second marriage, and that, instead of being entitled to one-half of the estate, she was in fact the sole heir of her husband, brought this suit to have her deed of conveyance set aside, upon the ground that it was entered into under a misapprehension of her legal rights. The chan-cellor, upon a record which presents no issues of fact dismissed the bill; and from this decree this appeal is prosecuted.

It is argued on behalf of the appellee that, since the deed was executed with full knowledge of the facts, it must stand, even if conceded to have been made under a mistake as to the law. We think, however, that the purport and effect of the holding in *A. & V. R. Co. v. Jones,* 73 Miss. 110, 10 South. 105, 55 Am. St. Rep. 488, destroy this contention. The deed was admittedly executed in the light of appellant's understanding of her legal rights as derived from the advice of eminent counsel, and it is clear to us that she would not have made the agreement had she believed that she was entitled to the entire estate. The mistake, if one was made, was as to her interest in the property, and this was a "mistake as to her own private legal rights and interests." 2 Pomeroy, Equity Jurisprudence, 841 *et seq.* We are therefore, and for the first time in Mississippi, called upon to decide whether marriage, without birth of issue, revokes the will made by a person before marriage, and not in contemplation of marriage. There is no dispute as to the com-

mon-law rule upon this subject. The authorities are all agreed that at common law the will of an unmarried man is not revoked by implication upon his marriage, unless a child be born of such marriage, but that the birth of issue does work a revocation or at least raises a strong presumption that a revocation has been wrought. This qualification of the rule will be considered presently in considering one phase of the argument.

It is said, however, on behalf of the appellee, that the statutes of Mississippi provide a complete scheme by which wills are executed and revoked; that the law of wills and their revocation in this state is all contained in the statutes, and that we need not concern ourselves with the common-law doctrine of implied revocations through marriage, or marriage and birth of issue; that sections 4489 and 4490 of the Annotated Code of 1892 are inconsistent with any theory of implied revocations, except such as are there mentioned and provided for. It must be admitted that the argument is forceful, and might prevail, if it were a matter of first impression in this state. Certainly this view has been taken by other courts of respectable authority. Thus by the civil code of California it was provided, by section 1292: "Except in the cases in this chapter mentioned, no written will, nor any part thereof, can be revoked or altered otherwise than: (1) By a written will or other writing of the testator, declaring such revocation or alteration, and executed with the same formalities with which a will should be executed by such testator; or, (2) by being burnt, torn, canceled, obliterated or destroyed with the intent and for the purpose of revoking the same, by the testator himself, or by some person in his presence, and by his direction." In construing this statute the California court held that: "The effect of these provisions is to do away with the doctrine of implied revocation, which was for so many years a subject of controversy in the English courts, and which, in many of the states of this country is still permitted, under a clause in their statutes authorizing a revocation to be 'implied by law from subsequent changes in

the condition or circumstances of the testator.' " *In re Comassi's Estate,* 107 Cal. 1, 40 Pac. 15, 28 L. R. A. 414. So in Texas, where the statute was substantially the same as ours (Pasch. Dig. arts. 5363 and 5364), it was held: "A statute which accomplishes effectually, as the one under consideration does, by engrafting upon every will the statute itself, the purpose of protecting, without revocation, the interest of afterborn children, evidences that it was not the intention of the legislature, in providing how wills might be revoked, or for what causes, to permit them to be revoked by implication in order to protect such persons, and thus let in the claims of all persons to a part of the estate who, but for the will, would be entitled to take under the statutes regulating the descent and distribution of the estates of intestates." *Morgan v. Davenport,* 60.Tex. 230.

But the difficulty which precludes us from adopting this simple and apparently obvious view is that as early as 1854 the High Court of Errors and Appeals in this state plainly repudiated this contention. By comparing our present statute with section 15, c. 49, art. 1, p. 649, Hutch. Code, it will be seen that the present statute is identical with the statute in effect in 1854, and it was then said: "It is urged by the counsel for the appellants that the common-law rule, that the marriage revokes the will of a woman before marriage, is changed by the act of 1821, which provides that 'no devise made,' according to the statute, 'or any clause thereof, shall be revocable but by the testator or testatrix canceling or obliterating the same, or causing it to be done in his or her presence, or by a subsequent will, codicil, or declaration in writing made as aforesaid.' Hutch. Code, p. 649. This statute is, in substance, the same as the sixth section of St. 29 Car. II. But, notwithstanding that statute and others to the same effect in this country, it is well settled in England and the United States that the statute applies to acts of direct and express revocation, and that a will may be revoked by implication or inference of law by various

93 Miss.—48

circumstances not within the purview of the statute (*Christopher v. Christopher,* Dick. 445; *Doe v. Lancashire,* 5 T. R. 49; *Brush v. Wilkins,* 4 Johns. Ch. [N. Y.] 507), among which is included the subsequent marriage of the woman (4 Kent's Com. 527; *Osgood v. Breed,* 12 Mass. 526). A doctrine so firmly settled, we do not feel disposed to call in question." *Garrett v. Dabney,* 27 Miss. 335. This view was clearly reannounced in the case of *Jones v. Moseley,* 40 Miss. 261, 90 Am. Dec. 327, where it was stated that a will would be impliedly revoked by certain changes in the condition of the testator. So, in view of the fact that our present statute has been five times re-enacted without change since the decision in *Garrett v. Dabney,* we cannot see our way clear to disregard the holding in that case, sanctioned as it is by the lapse of time and the numerous readoptions of the statute so construed. We must recognize the doctrine that implied revocations are still possible in spite of the statute.

We have seen that at common law a will was generally held to be revoked by implication in case of marriage, accompanied by the birth of issue, but that this result was not accomplished by marriage alone. It is contended by appellant, upon principle, and upon the authority of *Tyler v. Tyler,* 19 Ill. 151; *In re Teopfer's Estate,* 12 N. M. 372, 78 Pac. 53, 67 L. R. A. 315; *Morgan v. Ireland,* 1 Idaho 786; *Brown v. Scherrer,* 5 Colo. App. 255, 38 Pac. 427, and *Colcord v. Conroy,* 40 Fla. 97, 23 South. 561, that this rule of the common law, while in force to a limited extent, is yet so modified of necessity by reason of the change in the status of the wife—a change wrought by statute, and which permits the wife to inherit directly from the husband—that marriage alone is now sufficient to work an implied revocation. It is said that the reason why, at common law, marriage alone did not lead to revocation, was because by marriage no new heir was brought into the family, but only a person whose property rights were determined by the law of dower; that the wife never took as heir upon the death of her

husband, but as an incident to the marriage, and by virtue of the implied covenants of the marriage contract. Therefore it is said that, since by our law the wife is an heir, the rule upon any reasonable or logical interpretation must be held to be now in this state so modified as to make marriage alone the equivalent of marriage and birth of issue. Unquestionably this view finds some support in the authorities mentioned, although all of them, except *Brown v. Scherrer,* may be explained upon a consideration to be mentioned presently.

Looking at the question alone from the viewpoint of the reason of the common-law rule, it is said that the doctrine of implied revocation rests, not upon the view that without a revocation issue subsequently born would not otherwise be provided for, but solely upon the ground that the testator will not be presumed to have intended to disinherit the natural objects of his bounty. The importance of this distinction is obvious. If the first be the correct view, the reason of the common-law rule does not wholly fail in this state, since the law makes special provision for the wife, in that she is given the right to renounce the will and thereby defeat her husband's neglect or hostility. But if the second view be correct, that the will must be held to be revoked because the testator is not presumed to intend to omit the natural objects of his bounty, this is unquestionably a valid argument in favor of appellant's contention. This second view seems to have much weight with Chancellor Kent in his opinion in the leading case of *Brush v. Wilkins,* 4 Johns. Ch. (N. Y.) 506. In the opinion in this case he says: "It had become a settled rule of law and equity, as early as the year 1775, that implied revocations of wills were not within the statute of frauds, and that marriage and a child, taken together (though neither of them taken separately was sufficient), did amount to an implied revocation, and that such presumptive revocations might not be rebutted and controlled by circumstances. Without going minutely into all the cases, a cursory view of them will be sufficient to establish this position, and it can be shown

to have received continued and unceasing sanction down to this day."

Let us notice particularly that Kent states that the revocation is only presumptive, and that this presumption may be rebutted and controlled by circumstances. It would seem that this idea is entirely consistent with the view that the rule is bottomed upon a presumed intent, rather than upon the alleged disinclination of the law to leave an heir unprovided for; for, if the revocation is implied because of a presumption as to intention, it must be essentially a presumption of fact, and hence a rebuttable presumption. Now, if Kent is correct as to this being only a presumption, this case was clearly properly decided; for, the will being only presumptively revoked, it might well be that the widow knew of facts and circumstances which would have tended to overthrow this presumption. If so, she did no more, in executing the deed, than to compromise a doubtful case, or, rather, to decline a contest which she might have known would be hopeless. It is no answer to this observation to say that the burden of proof was upon the appellee to show the existence of these facts and circumstances. That would, of course, be true in a contest directly affecting the will. But this is a suit predicated of the contention that the will was utterly destroyed by the second marriage, and that the surviving widow was certainly entitled to the property. If there were, at the time of the settlement between the parties, unsettled issues of fact, which there might well have been, rendering the result doubtful, there was then a sufficient basis for a settlement which the courts would be slow to disturb; and this, we think, is what comes of the view that the common-law rule rests upon a presumed intent.

We have intimated that, but for the holding in *Garrett v. Dabney, supra,* we would incline to the view that our statutes furnish an all-sufficient scheme in which revocations by implication have no place. Let us see what *Garrett v. Dabney,* does hold, and why it holds it. The opinion in that case gives, as

the sole reason for allowing implied revocations despite the
statute, that the statute is almost an exact rescript of the stat-
ute of England (St. 29 Car. II), and that the English courts,
in construing this statute, had universally held that implied
revocations are not thereby abolished.    This must mean that
the English statute was adopted in Mississippi, together with
the construction put upon it by the English courts.    In other
words, as we see it, our court in *Garrett v. Dabney,* construed
our statute as if there was read into it a proviso that implied
revocations would still occur in case of marriage with birth of
issue, but not in case of marriage alone.    The Massachusetts
court in *Swan v. Hammond,* 138 Mass. 45, 52 Am. Rep. 255,
held that a statute providing, "but that nothing contained in
this section shall prevent the revocation implied by law from
subsequent changes in the condition or circumstances of the
testator," had the effect of limiting an implied revocation to
the circumstances under which revocation would occur at
common-law; and to the same practical effect.is *Brown v. Clark,*
77 N. Y. 369.   If these words, placed in a statute by the legis-
lature, work this result, why is the same result not reached when
they are written into the statute by the court?

No more convincing discussion of this question has been called
to our attention than is found in the opinion of the New
Hampshire court in *Hoitt v. Hoitt,* 63 N. H. 475, 3 Atl. 604,
56 Am. Rep. 530.   That court held that a subsequent marriage
without birth of issue did not revoke a will, and upon the gen-
eral subject made these pertinent observations:

"The English statute was doubtless the basis and model of
our statute, directly or indirectly; and the proviso in the latter
we think, is to be regarded as merely explanatory for the pre-
ceding part of the section, prescribing the manner of express
revocation..  Practically, and in effect, it was an adoption, un-
der then existing conditions, of such implied revocations as had
been introduced and established by the English courts, con-
trary to the plain meaning of the English statute, and solely

through the usurpation of legislative power. But the English courts did not go the length of establishing a rule that revocation might be shown by any change of circumstances affording satisfactory evidence of the testator's revoking intention, but stopped far short of it, and restricted its application to a few exceptional cases, as to which it was held the statute did not apply. Hence there is no tenable ground for holding that any causes of revocation were intended by our legislature to be embraced in the proviso to the act of 1822, aside from the existing exceptions established by the English courts upon supposed equitable considerations; and much less can it be held that any alteration was effected or intended by the revision of 1842, making the proviso a separate section and slightly changing its phraseology. And as strongly tending to show that the purpose of the legislature was such as had been indicated, and that such has been the universal understanding of the bar of this state, it is a significant fact that no litigation has arisen as to the legislative intent, or the meaning of the language used in its expression, during the more than sixty years which have elapsed since the statute was first enacted."

This opinion makes two observations of value here: First, that the whole doctrine of implied revocation is a judicial defeat of a plain legislative intent, and second, that it rests upon equitable considerations which can only be such as grow out of the manifest injustice of leaving an heir otherwise unprovided for.

The question received careful consideration at the hands of the Minnesota court in the case of *Carey v. Hewlett*, 66 Minn. 327, 69 N. W. 31, 34 L. R. A. 384, Am. St. Rep. 419. In view of the fact that the opinion reviews the authorities relied on by appellant and discusses the whole question, we set out the views of this court at some length. It is there said:

"This brings us to the last and most important question in the case, viz.: Was the will of Hulett revoked by his marriage to the respondent? At common law the marriage of a woman

absolutely revoked her will. The reason usually given was that, a married woman having no testamentary capacity, her will was no longer ambulatory. But the marriage of a man did not revoke his previous will in regard to either real or personal estate. This was not considered such a change of condition as would work a revocation by implication or inference of law. The reason usually given was that the law made for the wife a provision, independently of the act of the husband, by means of dower. But the marriage and the birth of issue conjointly revoked a man's will, whether of real or personal estate; these circumstances producing such a total change in the testator's condition as to lead to a presumption that he could not intend a disposition of property previously made to continue unchanged. The issue, the birth of which would revoke a will, must have been such as could have inherited the property which was the subject of the will, so that the effect of throwing open the property to the disposition of the law would have been to let in the after-born child or children, for whose benefit alone the implied revocation obtained. The chief reason why marriage and the birth of issue were deemed such a change of condition on the part of the testator as would work a revocation of his will was that otherwise his issue, which was the natural object of his bounty, would be wholly unprovided for, differing in that respect from the widow, for whom the law had made provision by means of dower. Hence it seems to have been the rule that marriage and the birth of issue would not produce the revocation of a will, where provision was made by the will itself for the children of the future marriage. At common law a married woman could not inherit from her husband. In case of her husband dying intestate, she was not entitled to anything out of his estate except her dower. While by our statutes dower *eo nomine* has been abolished, yet the law makes provision for the widow, independently of the act of the husband, much more liberal than the common law did. She is entitled, first, to a life estate in the homestead of her deceased husband,

free from any testamentary devise or other disposition to which she shall not have assented in writing, and free from all debts or claims against his estate; second, to an undivided third in fee simple, or such inferior tenure as the deceased husband was at any time during the coverture seized or possessed thereof, of one undivided third of all other lands of which the deceased was at any time during coverture seized or possessed, free from any testamentary or other disposition thereof to which she shall not have assented in writing, but subject in its just proportion with other real estate to the payment of such debts of the deceased as are not paid from the personal estate. Of the personal estate of which her husband dies possessed the widow is entitled to all his wearing apparel, his household furniture, not exceeding in value $500, other personal property to be selected by her not exceeding in value $500, a reasonable allowance for her maintenance during administration, which, in case the estate is insolvent, is not to be for more than one year. Gen. St. 1894, §§ 4470, 4471, 4477. Such is the provision which the law makes for the widow. The statute then provides that, where the husband dies intestate, the residue of his estate, real and personal, shall descend and be distributed as follows: First, to his children and to the lawful issue of any deceased child by representation; second, if there be no child, and no lawful issue of any deceased child, then to the surviving wife.

"It is mainly on this last provision by which the wife may inherit from her husband that counsel for the respondent base their contention that in this state marriage alone will revoke by implication of law the prior will of the husband. Their argument may all be summed up in the proposition that, inasmuch as a widow may now inherit from her husband (which she could not do at common law), therefore marriage alone effects the same change in the condition or circumstances of the husband as was effected under the common law by his marriage, and the birth of issue who would inherit. The courts of two of three Western states have taken substantially this position.

See *Tyler v. Tyler,* 19 Ill. 151; *Morgan v. Ireland,* 1 Idaho, 786; *Brown v. Scherrer,* 5 Colo. App. 255, 38 Pac. 427, approved and affirmed in 21 Colo. 481, 42 Pac. 668. In *Tyler v. Tyler, supra,* the question was not discussed at any great length, and the weight of that case as authority is somewhat impaired by the fact that in a subsequent case the court placed its refusal to reconsider the question mainly on the ground that the legislature had subsequently enacted that marriage alone, without the birth of issue, revoked a will, and hence that any decision which the court might make would be merely retroactive. The most able and forcible presentation of the arguments on that side of the question is to be found in the opinion of the Colorado Court of Appeals in *Brown v. Scherrer, supra.* But, after carefully considering all that has been said on that side, we are compelled to the conclusion that due weight has not been given to the fact that the main reason why, at common law, marriage and the birth of issue was deemed such a change in the condition or circumstances of the husband as would work as implied revocation of his prior will, was that otherwise his issue would be wholly unprovided for, a thing which was not to be supposed to have been in the contemplation of the testator; whereas, under our statutes, and, we assume, without special examination, under the statutes of those states in which the de cisions cited were rendered, even if the will stands, very liberal provision has been made for the widow independently of any act of the husband. There is a prevailing sentiment, often expressed by courts and text-writers, that marriage alone should be deemed such a change in condition and circumstances as will revoke a prior will. A statute to that effect was passd in England in 1837 (St. 1 Vict. c. 26), followed by the enactment of statutes to the same effect in many of the states of the union. How far this sentiment may have unconsciously influenced the decisions referred to it is impossible to say; but no court has ever assumed to hold on this ground alone, and in the absence of legislation affecting the question, that the common-law rule

was abrogated, or so far modified, that marriage would revoke a will.

"It is also suggested that the common-law rule had its origin in part in the ancient desire to build upon families and family estates, a consideration which has no place in this country. It is undoubtedly true that many of the doctrines of the common law had their origin in social or political conditions which have in whole or in part ceased. But this fact alone will not usually justify courts in holding that these doctrines, when once thoroughly established, have been abrogated, any more than it would justify them in holding that a statute had been abrogated because the reason for its enactment had ceased. Any such rule would leave the body of the common law very much emasculated, as, for example, that pertaining to real estate. While, undoubtedly, the common law consists of a body of principles applicable to new instances as they arise, and not of inflexible cast-iron rules, yet where the rules of the common law have become unsuited to changed conditions, political, social, or economic, it is the province of the legislature, and not of the courts, to modify them. While we do not wish to be understood as intimating that no condition of legislation upon the subject of the rights of married women in their estates of their husbands would effect by implication a change of the common-law rule, yet our conclusion is that, in view of the main reason upon which the common-law rule was based that marriage alone would not, but that marriage and the birth of issue conjointly would, revoke the prior will of a man, and in view of the very liberal provision made by statute for the widow, independently of the act of her husband, the mere fact that she may now, under the statute, in certain contingencies, inherit more from her husband, is not sufficient to warrant us in holding that the common-law rule has been changed, that marriage alone is such a change of condition or circumstances as will work an implied revocation of the prior will of the husband. We should have stated that our statute relating to the revocation of wills is

substantially, if not literally, the same as that of St. 29 Car. II, which has been so generally adopted by the American statutes."

This view has been widely accepted. It is indorsed in Indiana (*Bowers v. Bowers,* 53 Ind. 430), Wisconsin (*In re Lyon's Will,* 96 Wis. 339, 71 N. W. 362, 65 Am. St. Rep. 52), Connecticut (*Goodsell's Appeal,* 55 Conn. 171, 10 Atl. 557), Maryland (*Roane v. Hollingshead,* 76 Md. 369, 25 Atl. 307, 17 L. R. A. 592, 35 Am. St. Rep. 438), and Maine (*In re Hunt's Will,* 81 Me. 275, 17 Atl. 68). All of these cases, while containing some points of difference, support the doctrine of the *Minnesota case* in all substantial particulars. At least, they announce the continued existence of the common-law rule without modification, and disregard the argument that changed conditions should work a change in the rule. In the note to *Carey v. Hulett,* as reported in 61 Am. St. Rep., at page 431, it is stated the common-law rule is still in effect in the United States unless abrogated by statute. It is useless to say that great confidence can ordinarily be placed in the accuracy of these careful and scholarly notes. We think there can be no doubt that the decided weight of authority inclines to the view that a man's will is not revoked by a subsequent marriage without birth of issue.

It would protract this opinion to undue length to review in detail the authorities from Florida, Idaho, Illinois, New Mexico, and Colorado, holding to the contrary view. They are criticised in the case of *Carey v. Hulett, supra.* But one general observation may be made. All of these cases, except *Brown v. Scherrer,* are decided in states where an unrevoked will would leave the widow without any redress. If it be correct, as most of the American authorities hold, that the common-law rule is based upon the consideration that, if the will is permitted to stand, the heir would not receive any part of the estate, no reason can exist why the rule should be altered in this state, since the widow is well cared for by the right to renounce the will. It is not an accurate statement of the effect of our

statute that the wife is placed in the precise attitude of other heirs. She is more than that. She has the right to defeat absolutely any effort of the husband to prevent her participation in the estate. In this aspect, the right of renunciation is akin to that of dower. We think that the view by which we are bound is that indicated in *Garrett v. Dabney,* that the English statute has been incorporated into our law, and we cannot escape the conviction that the statute must be enforced as construed by the English courts.

*Affirmed.*