BAKER *v.* HARDY *et al.*

(Division B. Feb. 1, 1943. Suggestion of Error Overruled May 10, 1943.)

[11 So. (2d) 803. No. 35254.]

Stone & Stone, of Coffeeville, for appellant.

Cowles Horton, of Grenada, for appellees.

**Griffith, J.**, delivered the opinion of the court.

On November 14, 1932, appellant and appellees entered into a written agreement by which the small lot described in the contract was to be purchased by appellant from appellees, and the latter were to convey the same to appellant upon the payment of the purchase price thereof, to wit, $500. It was therein further agreed that appellant was to have a period of five years within which to pay the purchase price, but at the end of each year within that period appellant was to pay ten percent per annum interest on any part of the purchase price then unpaid.

It was further stipulated that appellant ''agrees to commence at once and construct and build on said lot or parcel of land a dwelling house and keep the same insured against fire with loss payable in favor of first parties as their interest appears, and it is agreed and understood that in the event the second party makes default in any of said interest installments or taxes or insurance premiums, at the option of said first parties this contract is to terminate and become null and void.'' All that was said in the contract about the dwelling house is contained in the above quotation, from which it is seen that there is nothing therein which specifies the kind, size or approximate cost of the dwelling to be erected, and default in respect to the dwelling house is not included in the items for which appellants would have the right, at their option, to terminate the engagement.

Soon after the date of the contract, appellant began the construction of a four or five room dwelling house with porches, and in May, 1933, he had so far progressed with the work that he was able to move into the house with his family. But in bringing the work to this point he had exhausted his limited resources, and was thereafter able to proceed only as he could secure sufficient employment to permit him to do more, and this in the depth of the depression which then involved the entire state, as well as the nation at large. The result was that

sometime about the spring of 1934, the house was still incomplete to the extent that about $125 in material was necessary to finish the building and about $70 to install sewage equipment, plus about $25 in labor, not including appellant's labor which, it is admitted, was bestowed in installing these further materials. And appellant had not been able to pay the ten percent interest on the principal of the purchase price due, according to the letter of the contract, on November 14, 1933.

This being the situation, in the spring of 1934 appellees began to insist that appellant must at once finish the house, and according to appellees' main and most dependable witness, John G. Hardy, appellees "would tell Jim all along that he had broken his contract. . . . We all met over there and saw Jim and discussed the condition of the house and told him that we would have to foreclose this contract, that we could not let it go on, the time had passed on it and the house was going to ruin." We need not quote further, but there is additional testimony to be gathered from the whole record to the same effect, and to the effect that appellees were insisting that there had been a default not only in not finishing the house earlier, but also in the supposed interest payable on the 14th of the previous November.

As a matter of fact, Jim was not in default as to the demanded interest payment because, being usury, as appellees now concede, Jim was under no obligation to pay it then, or at any other time, and he was in no coercible default in respect to the unfinished condition of the house, as we have already pointed out. But Jim is a negro and appellees are white people of some wealth and position, and the record further shows that Jim was not disposed to have any controversy with appellees, but, on the contrary, that at that time he trusted them. And appellees say that in the helpless situation in which they assumed to encompass Jim, he agreed that if appellees would furnish the material necessary to complete the

house, Jim would surrender his contract and become thence their tenant of the property.

According to Jim's testimony, which appellees do not dispute, he had expended on the house and outhouses in materials and labor more than $1,600, and this under circumstances of extreme hardship, evincing a will and earnestness on his part which for one of his color was of more than ordinary merit. And, as already mentioned, and according to all the testimony, including that in behalf of appellees, all that it took and all that was expended by appellees in order to finish the house, including sewerage and sanitary equipment, was the said sum of approximately $220.

If, then, Jim did surrender this valuable equity, in which he had put so much, for the poor privilege of becoming a tenant in his own house, as the chancellor held that he did, it is inescapable from this record that he did so under a mistake of law as to his private rights and interests.

In 2 Pomeroy Eq. Jur. (4th Ed.), Sec. 842, it is said: "The doctrine is settled that, in general, a mistake of law, pure and simple, is not adequate ground for relief. . . . If the mistake of law is not pure and simple but is induced or accompanied by other special features giving rise to an independent equity on behalf of the mistaken party, such as inequitable conduct of the other party, there can be no doubt that a court of equity will interpose its aid." And the author points out that there are courts which hold that the general doctrine that no relief will be afforded against mistakes of law applies only to mistakes of the general law, and not to mistakes of persons as to their own private legal rights and interests. This court, as disclosed in Railway Co. v. Jones, 73 Miss. 110, 121, 19 So. 105, and Hoy v. Hoy, 93 Miss. 732, 751, 48 So. 903, 25 L. R. A. (N. S.) 182, 136 Am. St. Rep. 548, 17 Ann. Cas. 1137, is aligned with those holding as last above stated. See also Williston on Contracts (Rev. Ed.), Sec. 1584 et seq., wherein among other considerations it is mentioned

that relief may be granted where the mistake has been induced by the opposite party, or where there has been no substantial change of position by the other party and considerable hardship would be imposed upon the one mistaken.

The case at bar comes within the foregoing principles. The supposed second agreement, if made, was ineffective to displace the original contract, and appellant having paid the entire principal sum, together with within a few dollars of the sums advanced by appellees in and after the spring of 1934, is entitled to the relief of specific performance which by his bill he has prayed.

On the point made by appellees that appellant did not perform his contract by paying the entire $500 when due, a sufficient reply is that he had paid the amount when the bill was filed. The written contract, as originally made, striking therefrom the illegal portions, remained in full force as we have already said, and the payments received must be credited to the contract in force, not upon a spurious or pretended contract sought to be set up instead, and the payments received having been sufficient to pay the contract amount and within a few dollars of the advancements, it is not available now to interpose the defense that these payments were not made on time. The acceptance thereof has foreclosed that issue. The rule in such cases is that even when there has been default in matter of time, equity will still grant relief if not to do so would result in great injury to the purchaser. 58 C. J., p. 1074, Sec. 328. As said in Packard v. Booth, 62 Wash. 333, 335, 113 P. 774: "Ordinarily, where a great injury will result to a party to a contract if the other party is allowed to repudiate it, it will be specifically enforced, notwithstanding some breach of its conditions may have been made by the party seeking to have it enforced, and this, particularly, if the breach is a violation of some condition relating to the payment of the purchase price; the governing principle being to give aid to that party having the greater equities."

Here, as already stated, appellees were out of pocket only the sum of $220, for which, being put into the house, they were amply secured under the law. And for this, if they were allowed to prevail, they would get in return a house and outhouses which cost appellant approximately $1,600 plus approximately $700 paid them in cash by appellant, or a total of approximately $2,300—for an outlay of only $220. Nothing is necessary beyond these stark figures to disclose who has the greater equities here.

The decree should have been for appellant, and we would so order except for the details now to be mentioned. Appellant should be charged (1) with the principal sum of $500 plus interest from but not before November 17, 1937, at the rate of six percent per annum. (2) With the $220, or whatever the exact sum is found to be, for the advances for material and labor made on the house by appellees with like interest from the dates payments therefor were made by appellees. (3) With the small insurance premiums on the house paid by appellees, and (4) with the taxes if there be any fair or proper method by which the amount of the taxes can be ascertained. The chancellor was correct in his holding that the alleged defaults charged against appellant in respect to the items of insurance and taxes were not such as to deprive him of the right to a specific performance, but equity requires them to be charged against appellant nevertheless. Against the foregoing four items appellant is to be credited with every payment he made to appellees, including the $20 for what is called in the record the "Tin," the debits and credits to be calculated upon the statutory partial payments plan. So accounting, if it be found that appellees have been fully paid, they shall be directed to execute to appellant forthwith a warranty deed. If a balance be found due by appellant, he will be ordered to pay to appellees within a short period of time the balance so found, for which he will be entitled to a deed. In default of the payment within the time allowed, a sale of the property will be ordered to be made by a commis-

sioner of the court and that out of the proceeds the appellees shall be first paid. And a commissioner may be appointed to make the conveyance above mentioned, as provided by Sec. 456, Code 1930.

Reversed and remanded.